ORIGINAL

FILED
FEB 7 2005
U.S. COURT OF
FEDERAL CLAIMS

UNITED STATES CLAIMS COURT

| | |
|---|---|
| CITY OF TACOMA, Department of Public Utilities, Light Division<br><br>Plaintiff,<br><br>vs.<br><br>UNTIED STATES OF AMERICA,<br><br>Defendant. | No. 05- 194C<br><br>COMPLAINT |

COMES NOW THE CITY OF TACOMA, Department of Public Utilities, Light Division, doing business as Tacoma Power and for complaint in this matter alleges as follows:

## I. JURISDICTION

1.1 Plaintiff is a First Class City and a Municipal Corporation of the State of Washington, operating a municipal public utility that provides electrical service to its customers in the Tacoma, Pierce County, Washington, area and does business under the name Tacoma Power, hereafter referred to as Tacoma Power.

1.2 The Defendant, United States Government, through its Department of Defense, United States Air Force (hereafter Air Force), owns and operates McChord Air Force Base and the base family housing area located in Washington State immediately south of the City of Tacoma.



ORIGINAL

Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

1.3 The Air Force contracts with Tacoma Power for the provision of electric service to McChord Air Force Base and the base family housing area, pursuant to Air Force Contract No. F45603-73-C-009. See Exhibit A attached and incorporated herein.

1.4 This action is a claim for money damages arising under this contract.

1.5 Jurisdiction over this action is conferred on this Court by Title 28 U. S. C. Section 1491, Title 41 U.S.C. Section 609 and Title 31 U.S.C. Section 3901.

## II. FACTS

2.1 Tacoma Power provides electrical service to its customers at rates approved by the City's Public Utility Board and established by Ordinance adopted by the City Council.

2.2 The rate setting process involves public participation through notice of the proposed rates and the opportunity to comment thereon in a number of public proceedings conducted by both the Public Utility Board and the City Council.

2.3 On February 26, 2003, the Public Utility Board approved a rate proposal for a general rate increase by Resolution U-9792. See Exhibit B attached and incorporated herein.

2.4 On March 18, 2003, the City of Tacoma, by Ordinance No. 27058, adopted the proposed general rate increase with the provision that the ordinance rate would become effective as of March 31, 2003. See Exhibit C attached and incorporated herein.

2.5 Air Force Contract No. F45603-73-C-009 contains a Change of Rates provision that reads as follows:

> "3. CHANGE OF RATES
>
> At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

> mutually agreed PROVIDED that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of service.
>
> No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the contractor has placed into effect a general rate decrease, a corresponding decrease in the contract rate shall be made."

2.6 Having placed into effect a general rate increase to all the City's customers, under similar conditions of service as required by Paragraph 3 of Air Force Contract No. F45603-73-C-009, the City notified the Air Force and commenced negotiations for a corresponding increase in Contract No. F45603-73-C-009.

2.7 The Air Force, in response, asserted that the rate adopted by the City Council was unfair to the Air Force because it included costs to the utility that the Air Force did not agree should be in the rate base. This position was expressed by letter dated August 25, 2003, from the Contracting Officer, with an attached consultant's report. See Exhibit D attached and incorporated herein.

2.8 The rate, adopted by the City Council, was based on a cost of service model which considers the costs to be incurred by the utility and thus included in the rate base; and was made pursuant to, and in conformance with, the cost of service model, the costs in the rate base, and the state law requirements that rates be just, fair, reasonable and sufficient.

2.9 The Air Force's claim, that certain costs should not be included in the rate base, rests on the assertion by the Contracting Officer that certain industrial customers, who had contracted on the open market for a portion of their electric load, should not be permitted to return to being full requirement customers, at the same melded rate offered to



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

the Air Force; but should be required to pay an incremental cost for power higher than that paid by the Air Force.

2.10 The City advised the Air Force that their position would require all other ratepayers to subsidize the Air Force's disagreement about utility policy and that such a result would result in rates for all other customers that are not just, fair, reasonable, or sufficient.

2.11 The Air Force's position continued to be unyielding, that the cost of the policy decision to allow returning industries to come back to Tacoma service at the melded system average, rather than requiring them to pay incremental costs to serve their load, could not be included in the Air Force rate.

2.12 Negotiations on this point failed totally.

2.13 By refusing to negotiate in good faith and adopting a non-negotiable intransigent position the Air Force has compelled the City to seek the opinion of this Court as the final rate authority.

2.14 Air Force Contract No. F45603-73-C-009 was modified January 1, 1987, by Contract Amendment Number P00003, which deleted the previous provision No.10 and substituted a new Disputes clause that reads as follows:

"10. DISPUTES

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601, et. seq.). If a dispute arises relating to the contract, the contractor may submit a claim to the Contracting Officer who shall issue a written decision on the dispute in the manner specified in DAR 1-314 (FPR 1-1.318).

(b) 'Claim' means
(1) a written request submitted to the Contracting Officer;
(2) for payment of money, adjustment of contract terms, or other relief;



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

> (3) which is in dispute or remains unresolved after a reasonable time for its review and disposition by the government; and
> (4) for which a Contracting Officer's decision is demanded.
>
> (c) In the case of disputed requests or amendments to such requests for payment exceeding $50,000, or with any amendment causing the total request in dispute to exceed $50,000, the contractor shall certify, at the time of the submission of a claim, as follows:
>
> I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount accurately reflects the contract adjustment for which the contractor believes the Government is liable."

See Exhibit E attached and incorporated herein.

2.15 The City submitted a claim on January 16, 2004. See Exhibit F attached and incorporated herein.

2.16 The Contracting Officer, advised the City that its January 16, 2004, claim was not certified as required by sub-paragraph 10(c) of the contract.

2.17 On March 8, 2004, the City submitted a certified claim in accordance with sub-paragraph 10(c) of the contract. See Exhibit G attached and incorporated herein.

2.18 On April 1, 2004, the Contracting Officer issued a final decision on the claim as stated in the letter of January 16, 2004, and as certified on March 8, 2004. See Exhibit H attached and incorporated herein.

2.19 This final decision of the Contracting Officer adopted a rate for the Air Force of its own devising.

2.20 This final decision of the Contracting Officer did not include any share of the costs included in the utility rate base associated with the return of certain contract customers to the City's system.



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

2.21 This final decision of the Contracting Officer was not based upon appropriate rate principles or any unfairness in the proposed rate to the Air Force, but on a supposed disagreement with a policy decision that the returning contract customers would resume paying a melded resource rate.

2.22 The provisions of Air Force Contract No. F45603-73-C-009 do not provide the Air Force license to make its own rates independent of the rate making principles that all rates must be just, fair, reasonable and sufficient.

2.23 Air Force Contract No. F45603-73-C-009 in effect provides that this Court is the ultimate rate authority with respect to an irreconcilable dispute between the parties, as this court has determined in prior cases. See *City of Tacoma v. United States*, 28 Fed. Cl. 637 (1993), *affirmed* 31 F.3d 1130 (Fed. Cir. 1994)

2.24 On the basis of all accepted rate principles, the rate the Air Force made in its final decision, set forth in P00024, is not an acceptable rate.

## III. CAUSES OF ACTION

## BREACH OF CONTRACT

**<u>COUNT ONE</u>: Breach of Implied Contract of Good Faith and Fair Dealing**

3.1 Air Force Contract No. F45603-73-C-009 contains a change of rates provision that impliedly promises that the process will be administered by the Air Force and its Contracting Officers in a fair and reasonable manner.

3.2 The Air Force Contracting Officer has an obligation of good faith and fair dealing regarding the implementation of the negotiated changes of rates provision of the contract.



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

3.3 The Air Force Contracting Officer did not negotiate the rate change in good faith in accordance with the requirements of the Contract.

3.4 The Air Force Contracting Officer imposed a rate of its own devising unrelated to accepted rate making principles.

**<u>COUNT TWO</u>: Arbitrary and Capricious Federal Action.**

3.5 The Air Force Contracting Officer is required to develop the Air Force's position regarding a negotiated rate considering the principles of rate making and the requirement that rates must be just, fair, reasonable and sufficient.

3.6 The change of rates provision of Air Force Contract No. F45603-73-C-009 is subject to the oversight of this Court pursuant to Paragraph 10 of the Contract.

3.7 This Court has the authority to determine whether the Air Force has acted arbitrarily and capriciously and abused its discretion in taking the unalterable position it adopted during the negotiations.

3.8 The Air Force Contracting Officer's final determination regarding the rate the Air Force is "willing to pay" is arbitrary and capricious and violates fundamental principles of rate making.

**<u>COUNT THREE</u>: Final Rate Making Authority.**

3.9 This Court has previously determined that it has the final rate making authority with respect to Air Force Contract No. F45603-73-C-009 is pursuant to the Contract Disputes Act which refers the matter to this court.

3.10 Considering the appropriate principles of rate making, the rate adopted by the City in Ordinance No. 27058 is the correct one and should be accepted by the Air



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

Force over the one proposed in P00024 which does not comply with the aforementioned appropriate principles of rate making.

IV. RELIEF

WHEREFORE Tacoma Power seeks the following relief:

4.1 Judgment against the United States in the amount of $153,128.31 and an Order of this court declaring that:

a. The rate adopted on March 31, 2003, is just, fair, reasonable, and sufficient and that the Air Force cannot arbitrarily and capriciously exclude costs used to calculate said rate without reasonable cause.

b. The Air Force does not have reasonable cause to exclude costs incurred by the utility from inclusion in the rates and the equitable distribution of those costs among all rate classes.

c. The proper rate for Air Force Contract No. F45603-73-C-009 is as stated in Ordinance No.27058.

4.2 Such additional money damages, in an amount to be determined by application of the Ordinance rate, for amounts accrued while this matter was pending.

4.3 In the alternative, an Order setting the appropriate rate for Contract No. F45603-73-C-009, and money damages in an amount to be determined by application of the appropriate rate as determined by this Court.

4.4 In the further alternative, if none of the previous relief be granted, an Order that the matter be remanded to the Contracting Officer with instructions to negotiate further in good faith.



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

4.5. The reasonable costs of pursuing redress which Tacoma Power was compelled to expend to secure just treatment under the contract.

4.5. For such other relief as the Court shall deem just and proper in the circumstances.

DATED this 1 day of ~~January~~ February, 2005

CITY OF TACOMA
DEPARTMENT OF PUBLIC UTILITIES
LIGHT DIVISION

By [signature]
Mark Crisson
Director of Utilities
3628 South 35th Street
Tacoma, Washington 98409
(253) 593-8200

By [signature]
Anne L. Spangler
Chief Assistant City Attorney
Department of Public Utilities
P. O. Box 11007
Tacoma, Washington 98411
(253) 593-218

OF COUNSEL
[signature]
George S. Karavitis
Senior Assistant City Attorney

Ward D. Groves
Assistant City Attorney



Office of the City Attorney
Department of Public Utilities
Administration Building
3628 South 35th Street
P.O. Box 11007
Tacoma, Washington 98411
(253) 502-8348

EXHIBIT "A"

P0001

# UNITED STATES AIR FORCE

## MILITARY AIRLIFT COMMAND

**CONTRACT NR. F45603-** 73-C-0009

**BASE McCHORD AFB WASHINGTON**

**CONTRACTOR** CITY OF TACOMA
DEPARTMENT OF PUBLIC UTILITIES (LIGHT DIVISION)
P. O. BOX 11007
TACOMA, WASHINGTON 98411

**CONTRACT AMOUNT:** Estimated Annual Cost $380,000.00

**FOR:** ELECTRICAL SERVICES FOR McCHORD AIR FORCE BASE AND McCHORD AIR FORCE BASE FAMILY HOUSING AREA, WASHINGTON

JAN 8 1973

MILITARY AIRLIFT COMMAND

STANDARD FORM 30, JULY 66
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1-16.101

XXXXX XXXXXXXXXXXXXXXXX/MODIFICATION OF CONTRACT

PAGE 1 OF 1

| XXXXX/MODIFICATION NO. | 2. EFFECTIVE DATE | 3. REQUISITION/PURCHASE REQUEST NO. | 4. PROJECT NO. (If applicable) |
|---|---|---|---|
| M01 | 72 Dec 20 | E72-1091 | N/A |

5. ISSUED BY — CODE

Procurement Office (62PMV)
P.O. Box 4178
McChord AFB, WA 98438

6. ADMINISTERED BY (If other than block 5) — CODE

7. CONTRACTOR NAME AND ADDRESS — CODE — FACILITY CODE

(Street, city, county, state, and ZIP Code)

City of Tacoma 40TIN
Department of Public Utilities
Light Division
P.O. Box 11007
Tacoma, WA 98411

8.

☐ AMENDMENT OF SOLICITATION NO. ______

DATED ______ (See block 9)

☒ MODIFICATION OF CONTRACT/XXXXX NO. F45603-73-C-0009

DATED 20 Nov 1972 (See block 11)

9. THIS BLOCK APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in block 12. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation, or as amended, by one of the following methods:

(a) By signing and returning ______ copies of this amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If, by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided such telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

10. ACCOUNTING AND APPROPRIATION DATA (If required)

11. THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS

(a) ☐ This Change Order is issued pursuant to ______

The Changes set forth in block 12 are made to the above numbered contract/order.

(b) ☐ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in block 12.

(c) ☐ This Supplemental Agreement is entered into pursuant to authority of ______

It modifies the above numbered contract as set forth in block 12.

12. DESCRIPTION OF XXXXX/MODIFICATION

a. In the "Electric Service Specification No. 3005", paragraph 3, the drawing number should be corrected to read, "McD 000-3005".

b. In General Provision 2, "Rates and Charges", paragraph (a) the reference to "Rate Schedule E-4" is further identified by adding "Ordinance No. 19320, Effective May 1, 1971".

c. In General Provision 2, "Rates and Charges", paragraph (b) the last word in the first line, "and", should be "any".

Except as provided herein, all terms and conditions of the document referenced in block 8, as heretofore changed, remain unchanged and in full force and effect.

13. ☐ CONTRACTOR/OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT ☐ CONTRACTOR/OFFEROR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ______ COPIES TO ISSUING OFFICE

14. NAME OF CONTRACTOR/OFFEROR

BY ______ (Signature of person authorized to sign)

17. UNITED STATES OF AMERICA

BY [signature] (Signature of Contracting Officer)

| 15. NAME AND TITLE OF SIGNER (Type or print) | 16. DATE SIGNED | 18. NAME OF CONTRACTING OFFICER (Type or print) | 19. DATE SIGNED |
|---|---|---|---|
| | | FRED J MAY | 73 Jan 02 |

Duplicate

UTILITY SERVICE CONTRACT

Department of the Air Force Contract Number F45603-73-C-0009

McChord Air Force Base, Tacoma, Pierce Washington 98438
Premises to be served City County State

City of Tacoma, Department of Public Utilities, Light Division,
Contractor

P. O. Box 11007, Tacoma, Washington 98411
Contractor's Address

Premises are: (x) Government Owned
( ) Government Leased

Name of Lessor: N/A Symbol Number of lease: N/A

Estimated annual cost $380,000.00. Bills will be rendered to Base Civil Engineers, Building No. 526 at McChord Air Force Base, Washington 98438.
Connection Charge $ None . Payments will be made by Accounting and Finance Officer at McChord Air Force Base, Washington 98438. Appropriation Chargeable: Applicable appropriation data will be entered on the payment voucher by the Accounting & Finance Office.
This contract is negotiated pursuant to 10 U.S.C. 2304(a)(10).
THIS CONTRACT is entered into as of 20 November 1972, by and between the UNITED STATES OF AMERICA, hereinafter called the Government, represented by the Contracting Officer executing this contract, and City of Tacoma, Department of Public Utilities Light Division, whose address is P. O. Box 11007, Tacoma, Washington 98411, hereinafter called the contractor.

HQ MAC
APPROVED 12 Dec 1972
F. T. CUNO, Colonel, USAF
Director of Procurement
DCS/Logistics

CONTRACT NO: F45603-73-C-0009

I. SCOPE. Subject to the terms and conditions hereinafter set forth, the Contractor shall furnish, and the Government shall purchase and receive, Electrical service (hereinafter called service) requested by the Government from the Contractor at the premises to be served hereunder (hereinafter called the service location), in accordance with the General and Technical Provisions and the Electrical service specifications attached hereto and made a part hereof.

II. TERM. This contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

CITY OF TACOMA
Department of Public Utilities, Light Div.
Name of Contractor

BY [signature]
Signature

Gordon N. Johnston
Typed Name

Mayor
Title

Attest: [signature]
H. B. LORD, City Clerk

Approved: [signature]
A. J. Benedetti
Director of Utilities

Approved as to form & legality: [signature]
Paul J. Nolan, Deputy City Attorney

UNITED STATES OF AMERICA

BY [signature] 72 Mar 20
Signature of Contracting Officer and date.

Fred J. May
Typed Name of Contracting Officer

I. TECHNICAL PROVISIONS

1. MEASUREMENT OF SERVICE

(a) All service furnished by the Contractor shall be measured by metering equipment of standard manufacture, furnished, installed, maintained, calibrated, and ready by the Contractor at his expense. When more than a single meter is installed at the service location, the readings thereof shall be billed conjunctively. In the event that any meter fails to register or registers incorrectly, the quantity of service delivered through it during that period shall be determined and an equitable adjustment based thereon shall be made in the Government's bills (for this purpose any meter which registers not more than two (2) percent slow or fast shall be deemed correct). Failure to agree on any adjustment shall be a dispute concerning a question of fact within the meaning of the "Disputes" clause of this contract.

(b) The Contractor shall read all meters at periodic intervals of approximately thirty (30) days. All billings based on meter readings of less than twenty-seven (27) days or more than thirty-two (32) days shall be prorated accordingly.

2. METER TEST

The Contractor, at his expense, shall periodically inspect and test the meters installed by him, at intervals of no longer than one (1) year. At the written request of the Contracting Officer, the Contractor, in the presence of Government representatives, shall make additional tests of any or all meters. The cost of such additional tests shall be borne by the Government if the percentage of error is found to be not more than two (2) percent slow or fast. No meter shall be placed in service which on test registers in excess of one hundred (100) percent under normal operating conditions.

II. GENERAL PROVISIONS

1. PAYMENT

(a) The Contractor shall be paid by the designated disbursing officer for service furnished hereunder at the rates specified; PROVIDED, that the Government shall be liable for the minimum monthly charge specified in this contract commencing with the billing period in which service is initially furnished and continuing until this contract is terminated, except that the minimum monthly charge shall be equitably prorated for the billing period in which commencement and termination of this contract shall become effective.

(b) Payments hereunder shall be contingent upon the availability of appropriations therefor, and shall not be made in advance of the service rendered.

(c) All bills for service shall be paid without penalty or interest and the Government shall be entitled to any discounts customarily applicable to payment of bills by all customers of the Contractor.

(d) Invoices for service rendered hereunder shall contain statements of the meter readings at the beginning of the billing period, meter constants, consumption during the billing period, and such other pertinent data as shall be required by the Government.

(e) The Contractor hereby declares that rates are not in in excess of the lowest rates now available to any existing or prospective customer under like conditions of service, and agrees that during the life of this contract the Government shall continue to be billed at the lowest available rate for similar conditions of service.

2. RATES AND CHARGES.

(a) For all service furnished under this contract to the service location the Government shall pay the Contractor at the rates specified in the Rate Schedule E-4 ^ORDINANCE No. 19320, EFFECTIVE MAY 1, 1971 c/P00001^ attached hereto and made a part of this contract.

(b) For purposes of charges under this paragraph 2, ~~and~~ ^4^ c/P00001 demands due to faulty operation of, or to excessive or fluctuating pressure on, the Contractor's system shall not be included as part of the Government's demand.

3. CHANGE OF RATES

At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as mutually agreed PROVIDED that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of service.

No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the Contractor has placed into effect a general rate decrease, a corresponding decrease in the contract rate shall be made.

4. CHANGE IN VOLUME OF CHARACTER OF SERVICE

The Contracting Officer shall give reasonable notice to the Contractor respecting any material changes anticipated in the volume or characteristics of the utility service required at each location.

5. CONTINUITY OF SERVICE AND CONSUMPTION

(a) The Contractor shall use reasonable diligence to provide a regular and uninterrupted supply of service at the service location, but shall not be liable to the Government for damages, breach of contract, or otherwise, for failure, suspension, diminution, or other variations of service occasioned by any cause beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, or failure or breakdown of transmission or other facilities; PROVIDED, that when any failure, suspension, diminution, or variation of service shall aggregate more than two (2) hours during any billing period hereunder, an equitable adjustment shall be made in the monthly rates specified in this contract (including the minimum monthly charge).

(b) In the event the Government is unable to operate the service location in whole or in part for any cause beyond its control and without its fault or negligence, including but not limited to acts of God or of the public enemy, fires, floods, epidemics, quarantine restrictions, or strikes, an equitable adjustment shall be made in the monthly rates specified in this contract (including the minimum monthly charge) if the period during which the Government is unable to operate the service location in whole or in part shall exceed fifteen (15) days during any billing period hereunder.

6. CONTRACTOR'S FACILITIES

(a) The Contractor, at his expense, shall furnish, install, operate, and maintain all facilities required to furnish service hereunder to, and to measure the service at, the point of delivery specified in the Utility Service Specifications. Title to all of these facilities shall remain in the Contractor and he shall be responsible for all loss of or damage to those facilities except that arising out of the fault or negligence of the Government, its agents or its employees. All taxes and other charges in connection therewith, together with all liability arising out of the negligence of the Contractor in the construction, operation, or maintenance of these facilities, shall be assumed by the Contractor.

(b) The Government hereby grants to the Contractor, free of any rental or similar charge, but subject to the limitations specified in this contract, a revocable permit to enter the service location for any proper purpose under this contract, including use of the site or sites agreed upon by the parties hereto for the installation, operation, and maintenance of the facilities of the Contractor required to be located upon Government premises. Authorized representatives of the Contractor will be allowed access to the facilities of the Contractor at suitable times to perform the obligations of the

Contractor with respect to these facilities. It is expressly understood that the Government may limit or restrict the right of access herein granted in any manner considered to be necessary for the national security.

(c) The facilities shall be removed and Government premises restored to their original condition, ordinary wear and tear excepted, by the Contractor at his expense within a reasonable time after the Government shall revoke the permit herein granted and in any event within a reasonable time after termination of this contract, PROVIDED, that in the event of termination due to fault of the Contractor these facilities may be retained in place at the option of the Government until service comparable to that provided for hereunder is obtained elsewhere.

7. CONFLICTS

To the extent of any inconsistency between the provisions of this contract, and the provisions of any schedule, rider, or exhibit incorporated in this contract by reference or otherwise, the provisions of this contract shall control.

8. DEFINITIONS (1962 FEB)

As used throughout this contract, the following terms shall have the meanings set forth below:

(a) The term "Head of the Agency" or "Secretary" means the Secretary, the Under Secretary, any Assistant Secretary, or any other head or assistant head of the executive or military department or other Federal agency; and the term "his duly authorized representativ means any person or persons or board (other than the Contracting Officer authorized to act for the Head of the Agency or the Secretary.

(b) The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

(c) Except as otherwise provided in this contract, the term "subcontracts" includes purchase orders under this contract.

9. ASSIGNMENT OF CLAIMS (1962 FEB)

(a) Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), if this contract provides for payments aggregating $1,000 or more, claims for monies due or to become due the Contractor from the Government under this contract

may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Unless otherwise provided in this contract, payments to an assignee of monies due or to become due under this contract shall not, to the extent provided in said Act, as amended, be subject to reduction or set-off.

(b) In no event shall copies of this contract or of any plans, specifications, or other similar documents relating to work under this contract, if marked "Top Secret", "Secret", or "Confidential", be furnished to any assignee of any claim arising under this contract or to any other person not entitled to receive the same. However, a copy of any part or all of this contract so marked may be furnished, or any information contained therein may be disclosed, to such assignee upon the prior written authorization of the Contracting Officer.

10. DISPUTES (1958 JAN)

(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of his appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

(b) This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above; PROVIDED, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

(c) The provisions of (a) above shall not apply to disputes which are subject to the jurisdiction of a Federal, State, or other appropriate regulatory body. The provisions of (a) above shall also be subject to the requirements of the law with respect to the rendering of utility services and the collection of regulated rates. (1968 SEP)

11. OFFICIALS NOT TO BENEFIT (1949 JUL)

No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

12. COVENANT AGAINST CONTINGENT FEES (1958 JAN)

The contractor warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this contract without liability or in its discretion, to deduct from the contract price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

13. EXAMINATION OF RECORDS BY COMPTROLLER GENERAL (1971 MAR)

(a) This clause is applicable if the amount of this contract exceeds $2,500 and was entered into by means of negotiation, including small business restricted advertising, but is not applicable if this contract was entered into by means of formal advertising.

(b) The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under this contract or such lesser time specified in either Appendix M of the Armed Services Procurement Regulation or the Federal Procurement Regulations Part 1-20, as appropriate, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract.

(c) The Contractor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under the subcontract or such lesser time specified in either Appendix M of the Armed Services Procurement Regulation or the Federal Procurement Regulations Part 1-20, as appropriate,

have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor, involving transactions related to the subcontract. The term "subcontract" as used in this clause excludes (i) purchase orders not exceeding $2,500 (ii) subcontracts or purchase orders for public utility services at rate established for uniform applicability to the general public.

(d) The periods of access and examination described in (b) and (c) above for records which relate to (i) appeals under the "Disputes" clause of this contract, (ii) litigation or the settlement of claims arising out of the performance of this contract, or (iii) costs and expenses of this contract as to which exception has been taken by the Comptroller General or any of his duly authorized representatives, shall continue until such appeals, litigation, claims or exceptions have been disposed of.

14. GRATUITIES (1952 MAR)

(a) The Government may, by written notice to the Contractor, terminate the right of the Contractor to proceed under this contract if it is found, after notice and hearing, by the Secretary or his duly authorized representative, that gratuities (in the form of entertainment, gifts, or otherwise) were offered or given by the Contractor, or any agent or representative of the Contractor, to any officer or employee of the Government with a view toward securing a contract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing of such contract; PROVIDED, that the existence of the facts upon which the Secretary or his duly authorized representative makes such findings shall be in issue and may be reviewed in any competent court.

(b) In the event this contract is terminated as provided in paragraph (a) hereof, the Government shall be entitled (i) to pursue the same remedies against the Contractor as it could pursue in the event of a breach of the contract by the Contractor, and (ii) as a penalty in addition to any other damages to which it may be entitled by law, to exemplary damages in an amount (as determined by the Secretary or his duly authorized representative) which shall be not less than three nor more than ten times the costs incurred by the Contractor in providing any such gratuities to any such officer or employee.

(c) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

15. BUY AMERICAN ACT (1964 MAY)

(a) In acquiring end products, the Buy American Act (41 U.S.C 10a-d) provides that the Government give preference to domestic source end products. For the purpose of this clause:

(i) "components" means those articles, materials, and supplies, which are directly incorporated in the end products;

(ii) "end products" means those articles, materials, and supplies, which are to be acquired under this contract for public use; and

(iii) a "domestic source end product" means (A) an unmanufactured end product which has been mined or produced in the United States and (B) an end product manufactured in the United States if the cost of the components thereof which are mined, produced, or manufactured in the United States or Canada exceeds 50 percent of the cost of all its components. For the purpose of this (a)(iii)(B), components of foreign origin of the same type or kind as the products referred to in (b) (ii) or (iii) of this clause shall be treated as components mined, produced, or manufactured in the United States.

(b) The Contractor agrees that there will be delivered under this contract only domestic source end products, except end products:

(i) which are for use outside the United States;

(ii) which the Government determines are not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality;

(iii) as to which the Secretary determines the domestic preference to be inconsistent with the public interest; or

(iv) as to which the Secretary determines the cost to the Government to be unreasonable.

(The foregoing requirements are administered in accordance with Executive Order No. 10582, dated December 17, 1954. So as to alleviate the impact of Department of Defense expenditures on the United States balance of international payments, bids offering domestic source end products normally will be evaluated against bids offering other end products by adding a factor of fifty percent (50%) to the latter, exclusive of import duties. Details of the evaluation procedure are set forth in Section VI of the Armed Services Procurement Regulation).

16. CONVICT LABOR (1949 MAR)

In connection with the performance of work under this contract, the Contractor agrees not to employ any person undergoing sentence of imprisonment at hard labor.

17. CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION (1969 NOV)

This contract, to the extent that it is of a character specified in the Contract Work Hours and Safety Standards Act (40 U.S.C. 327-333), is subject to the following provisions and to all other applicable provisions and exceptions of such Act and the regulations of the Secretary of Labor thereunder.

(a) OVERTIME REQUIREMENTS. No Contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any laborer or mechanic in any workweek in which he is employed on such work to work in excess of eight hours in any calendar day or in excess of forty hours in such workweek on work subject to the provisions of the Contract Work Hours and Safety Standards Act unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all such hours worked in excess of eight hours in any calendar day or in excess of forty hours in such workweek, whichever is the greater number of overtime hours.

(b) VIOLATION; LIABILITY FOR UNPAID WAGES; LIQUIDATED DAMAGES. In the event of any violation of the provisions of paragraph (a), the Contractor and any subcontractor responsible therefor shall be liable to any affected employee for his unpaid wages. In addition, such Contractor and subcontractor shall be liable to the United States for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic employed in violation of the provisions of paragraph (a) in the sum of $10 for each calendar day on which employee was required or permitted to be employed on such work in excess of eight hours or in excess of his standard workweek of forty hours without payment of the overtime wages required by paragraph (a).

(c) WITHHOLDING FOR UNPAID WAGES AND LIQUIDATED DAMAGES. The Contracting Officer may withhold from the Government Prime Contractor, from any moneys payable on account of work performed by the Contractor or subcontractor, such sums as may administratively be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the provisions of paragraph (b).

(d) SUBCONTRACTS. The Contractor shall insert paragraphs (a) through (d) of this clause in all subcontracts, and shall require their inclusion in all subcontracts of any tier.

(e) RECORDS. The Contractor shall maintain payroll records containing the information specified in 29 CFR 516.2(a). Such records shall be preserved for three years from the completion of the contract.

18. EQUAL OPPORTUNITY (1972 AUG)

During the performance of this contract, the contractor agrees as follows:

(1) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this nondiscrimination clause.

(2) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the contractor's commitments under this Equal Opportunity clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Contractor will furnish all information and reports require by Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, and by the rules, regulations, and orders of the Secretary of Labor or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Contractor's noncompliance with the Equal Opportunity clause of this contract or with any of said rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Contractor will include the provisions of Paragraph (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance: Provided, however, that in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

19. STABILIZATION OF PRICES, RENTS, WAGES, AND SALARIES (1972 AUG, DPC NO. 103)

(a) By Executive Order 11640, dated January 26, 1972, the President further implemented his stabilization program and confirmed and ratified all orders, regulations, circulars, or other directives issued and all other actions taken pursuant to Executive Order No. 11615, as amended and Executive Order No. 11627, as amended. The Contractor represents that to the best of his knowledge and belief he is in complete compliance with Executive Order 11640, as amended, if applicable. Further the Contractor warrants that insofar as Executive Order 11640, as amended, is applicable, the amounts invoiced under this contract will not exceed the lower of (1) the contract price, or (2) the maximum levels established in accordance with the order.

(b) The contractor agrees to insert the substance of this clause, including this paragraph (b), in all subcontracts for supplies or services issued under this contract.

20. PAYMENT OF INTEREST ON CONTRACTORS' CLAIMS (1972 MAY)

(a) If an appeal is filed by the Contractor from a final decision of the Contracting Officer under the DISPUTES clause of this contract, denying a claim arising under the contract, simple interest on the amount of the claim finally determined owed by the Government shall be payable to the Contractor. Such interest shall be at the rate established by the Secretary of the Treasury pursuant to Public Law 92-41; 85 STAT 97 for the Renegotiation Board, from the date the Contractor furnishes to the Contracting Officer his written appeal pursuant to the DISPUTES clause of this contract, to the date of (i) a final judgment by a court of competent jurisdiction, or (ii) mailing to the Contractor of a supplemental agreement for execution either confirming completed negotiations between the parties or carrying out a decision of a Board of Contract Appeals.

(b) Notwithstanding (a) above, (i) interest shall be applied only from the date payment was due, if such date is later than the filing of appeal; and (ii) interest shall not be paid for any period of time that the Contracting Officer determines the Contractor has unduly delayed in pursuing his remedies before a Board of Contract Appeals or a court of competent jurisdiction.

21. APPROVAL OF CONTRACT (1949 JUL)

(If this contract exceeds $50,000.00 the following clause shall be applicable)

This contract shall be subject to the written approval of the Secretary or his duly authorized representative and shall not be binding until approved.

22. SUPERSEDED CONTRACT

The Contractor and the Government mutually agree, upon commencement of services under this contract, that Contract No. AF(45-603)-297 dated 1 May 1957, as amended, which has provided the Government similar services, is hereby superseded, and will be terminated by Supplemental Agreement, without penalty to either party. The Contractor further agrees to unconditionally waive any claim against the Government by reason of such termination, except for service billings due or to become due.

McCHORD AIR FORCE BASE AND McCHORD AIR FORCE BASE FAMILY HOUSING

ELECTRIC SERVICE SPECIFICATIONS
NO. 3005

1. SPECIFIC PREMISES TO BE SERVED: McChord Air Force Base, Washington and McChord Air Force Base Family Housing Area

2. ESTIMATED SERVICE:

Estimated maximum demand: 14,000 KW

Estimated annual consumption: 80,000,000 KWH

The Government is in no way obligated to use nor is it restricted to the above estimate.

3. POINT OF DELIVERY. The point of delivery of service shall be on the Bus structure at the Contractor's transformer station indicated on Drawing No. McD 000-3000, 10 Dec 1971.

4. DESCRIPTION OF ELECTRIC SERVICE. Contractor will supply three-phase, three-wire, 60-cycle, alternating current at 13,800 volts. The voltage of Contractor's high tension line is 110,000. volts.

5. METERING AND BILLING. Service will be measured at 13,800 volts by one watt hour meter and one demand meter.

1 Atch
Dwg No. McD 000-3005, Site Plan, dated 10 December 1971

10 APRIL 1972

Attached to and made a part
Contract F45603-73-C-0009




McCHORD AIR FORCE BASE AND AIR FORCE FAMILY HOUSING
ELECTRICAL UTILITY SERVICES
SITE PLAN

DWG MCD 000-3005

10 DEC 1971

TACOMA CITY LIGHT

PRIMARY POWER RATE

SCHEDULE E-4

12.06.230

AVAILABILITY:

This rate is available at primary voltages at one point of delivery for lighting, heating and incidental power for governmental agencies owning their primary distribution facilities where the connected load is in excess of 2000 kilowatts.

TERMS OF THE RATE:

1. Rate Per Month:

(a) Demand Charge:

First 80 kilowatts of billing demand .................. $1.75 per kW
Over 80 kilowatts of billing demand .................. $0.70 per kW

(b) Energy Charge:

All energy measured in kilowatt-hours .......... $0.0035 per kWH

(c) Minimum Charge:

One dollar ($1.00) per kilowatt of billing demand per month or any fraction thereof.

(d) Billing Demand:

(1) Determined by means of a demand meter, thirty-minute interval, reset monthly.

(2) The billing demand shall be the highest of:

a. The highest measured demand for the month adjusted for power factor.

b. Eighty percent (80%) of the highest measured demand occurring during any of the preceding eleven months after adjustment for power factor.

2. Service Conditions:

(a) Power factor provision applicable.

(b) Applicable provisions of the City Code, General Provisions and Customer Service Policies governing the sale of electric energy shall apply.

Ordinance No. 19320 Effective May 1, 1971

CONTRACT NO: F45603-73-C-0009

# LIST OF DOCUMENTS AND ATTACHMENTS

1. Utility Service Contract, Face Sheet, Page 1 of 14 Pages.
2. Signature Sheet, Page 2 of 14 Pages.
3. Section I, Technical Provisions 1 and 2, Page 3 of 14 Pages.
4. Section II, General Provisions 1 thru 22, Pages 4 thru 14.
5. Electrical Service Specifications No. 3005, dated 10 April 1972, one page only, with 1 attachment. SITE PLAN, DRAWING NO. McD 000-3005, dated 10 December 1971, 1 sheet only.
6. Rate Schedule E-4, Primary Power Rate, Ordinance No. 19320, Effective May 1, 1971, one page only.
7. List of Documents and Attachments, one page only.

EXHIBIT "B"

# RESOLUTION NO. U-9792

WHEREAS the City of Tacoma's Light Division (d.b.a. Tacoma Power) needs an electric rate adjustment in order to provide sufficient revenue to cover the costs of providing electric service to its customers, and

WHEREAS Tacoma Power's revenue requirement analysis for the twenty-four month rate period from March 31, 2003 through March 31, 2005, indicates a revenue shortfall of approximately $24.3 million based on electric rates adopted October 1, 2001, and

WHEREAS the main drivers for this shortfall are stranded costs due to the loss of a major industrial load, revenue financing of 25% of renewal and replacement capital, the Bonneville Power Administration (BPA) power and transmission costs, Contract Industrial customer's rates coming within the melded portfolio and other inflation related costs, and

WHEREAS in addition the BPA has indicated that it intends to implement its Safety Net (SN) Cost Recovery Adjustment Clause (CRAC) with an adjustment of approximately 25% which potentially would impact Tacoma Power financially by $31 million dollars, and

WHEREAS to deal with this financial impact Tacoma Power recommends amending and revising Chapter 12.06 of the Tacoma Municipal Code regarding electric energy regulations and rates and adopting a Safety Net Cost Recovery Adjustment Clause (SN CRAC) of its own, which

adjustments are just, fair, reasonable and sufficient, and in compliance with all laws; Now, Therefore,

BE IT RESOLVED BY THE PUBLIC UTILITY BOARD OF THE CITY OF TACOMA

That the proposed electric rate adjustments including the Safety Net Cost Recovery Adjustment Clause are approved and the City Council is requested to approve an ordinance for this purpose substantially in the same form as on file with the Clerk of the Board.

Approved as to form and legality:

Robert C. Lane
Chairman

Mark Bubenik
Chief Assistant City Attorney

William J. Barker
Secretary

Elizabeth Larson
Acting Clerk

Adopted February 26, 2003

CITY OF TACOMA
DEPARTMENT OF PUBLIC UTILITIES

Request for Board Meeting
February 26, 2003

# REQUEST FOR RESOLUTION

Date: February 19, 2003

INSTRUCTIONS: File request in the Office of the Director of Utilities as soon as possible but not later than nine working days prior to the Board meeting at which it is to be introduced. Completion instructions are contained in Administrative Policy POL-104.

1. Summary title for Utility Board agenda: (not to exceed twenty-five words)
   Amend and revise Chapter 12.06 of the official Code of the City of Tacoma regarding electric energy regulations and rates.

2. A resolution is requested to: (brief description of action to be taken, by whom, where, cost, etc.)
   Approve revised Electric Regulations and Rates Ordinance. These rate revisions would be effective March 31, 2003.

3. Summarized reason for resolution:
   Tacoma Power's revenue requirements analysis for the twenty-four-month rate period (March 31, 2003 through March 31, 2005) indicates a revenue shortfall of approximately $24.3 million based on October 1, 2001 rates. The main drivers for this shortfall are stranded costs due to the loss of a major industrial load, revenue financing of 25% of renewal and replacement capital, the Bonneville Power Administration (BPA) power and transmission costs, melded portfolio and other inflation related costs.

   A Cost adjustment clause has been added to the ordinance to deal with the financial impacts of an anticipated BPA Safety Net Cost Recovery Adjustment Clause implementation October 1, 2003.

4. Attachments:
   a. Letter to Public Utility Board and City Council from Mark Crisson dated February 19, 2003
   b. Proposed Rate Ordinance (on file with the Clerk of the Board)
   c. Memo from Steven J. Klein to Mark Crisson regarding public forums held (on file with Clerk of the Board)

5. ☐ Funds available ☐ Proposed action has no budgetary impact

6. Deviations requiring special waivers:

| Originated by: | Requested by: | Approved: |
|---|---|---|
| [signature] George Whitener | [signature] Steven J. Klein | [signature] Mark Crisson |
| Section Head | Division Head | Director of Utilities |

Document1

Tacoma

# REQUEST FOR ORDINANCE OR RESOLUTION

**CITY CLERK USE**

Request #:
Ordinance #:
Resolution #:

1. Date: February 19, 2003

| 2. Requesting Department/Division/Program | 3. Contact Person (for questions): | Phone/Extension |
|---|---|---|
| TPU/*Tacoma Power* | ***Steven J, Klein*** | 502-8203 |

4. Preparation of Ordinance is requested for the City Council meeting of Tuesday, March 11, 2003

5. Summary Title/Recommendation: (A concise sentence, as it will appear on the Council Agenda)

Amend and revise Chapter 12.06 of the official Code of the City of Tacoma regarding electric energy regulations and rates.

6. Background Information/General Discussion: (Why is this request necessary? Are there legal requirements? What are the viable alternatives? Who has been involved in the process?)

Approve revised Electric Regulations and Rates Ordinance. These rates revisions would be effective March 31, 2003. Tacoma Power's revenue requirements analysis for the twenty-four-month rate period (March 31, 2003 through March 31, 2005) indicates a revenue shortfall of approximately $24.3 million based on October 1, 2001 rates. The main drivers for this shortfall are stranded costs due to the loss of a major industrial load, revenue financing of 25% of renewal and replacement capital, the Bonneville Power Administration (BPA) power and transmission costs, melded portfolio and other inflation related costs.

A cost adjustment clause has been added to the ordinance to deal with the financial impacts of an anticipated BPA Safety Net Cost Recovery Adjustment Clause implementation October 1, 2003.

7. Financial Impact: (Future impact on the budget.)

This rate ordinance is necessary to assist Tacoma Power in meeting their financial obligations.

8. List all material available as backup information for the request and indicate where filed:

| Source Documents/Backup Material | Location of Document |
|---|---|
| a. Letter to the Public Utility Board and City Council from Mark Crisson | Attached |
| b. Proposed Rate Ordinance | Attached |
| c. Memo from Steven J. Klein to Mark Crisson regarding public forums held | Attached |

9. Funding Source: (Enter amount of funding from each source)

| Fund Number & Name: | State $ | City $ | Other $ | Total Amount |
|---|---|---|---|---|
| | | | | |

If an expenditure, is it budgeted? ☐ Yes ☐ No Where? Org # Acct #

| 10. [signature] ~~Department Director~~/Utility Division Approval | Approved as to Availability of Funds<br>Director of Finance | [signature] ~~City Manager~~/Director Utilities Approval |
|---|---|---|

TACOMA PUBLIC UTILITIES
3628 South 35th Street
Tacoma, Washington 98409-3192

February 19, 2003

To the Chairman and Members of the Public Utility Board and
to The Mayor and Members of the City Council

Tacoma Power requests approval by the Public Utility Board and the City Council for a rate increase effective March 31, 2003. The proposed rate increase is designed to generate projected revenue requirements for utility operations.

In preparation for this request, Tacoma Power has sought public input through several public forums and presentations at Neighborhood Councils and several city council meetings in communities served by Tacoma Power. A public hearing was held by the Public Utility Board on February 13, 2003 and a joint City Council/Public Utility Board study session was held on January 28, 2003.

Tacoma Power's revenue requirements analysis for the twenty-four-month rate period (March 31, 2003 through March 31, 2005) indicates a revenue shortfall of approximately $24.3 million based on October 1, 2001 rates. The main drivers for this shortfall are stranded costs due to the loss of a major industrial load, revenue financing of 25 percent of renewal and replacement capital, Bonneville Power Administration (BPA) power and transmission costs, melded portfolio and other inflation related costs.

In addition to the costs noted above, the BPA has indicated that it intends to implement its Safety Net (SN) Cost Recovery Adjustment Clause (CRAC). Although no specific level has been formally proposed, adjustments of approximately 25 percent have been discussed. The potential impact to Tacoma Power of a 25 percent SN CRAC would be $31 million dollars. To deal with this additional uncertainty, Tacoma Power is recommending the adoption of a Cost Adjustment Clause (CAC) of its own which is written into the rate ordinance and tied to the BPA SN CRAC.

As a result of discussions held during the last rate increase, Tacoma Power along with policy makers, citizens and action agency groups have developed recommendations for the rate assistance programs, which have been incorporated into this rate ordinance proposal. In summary, eligibility requirements for the low income discount have been revamped to better serve the needs of that segment of low income customers least able to provide for themselves. In addition other rate assistance programs have been restructured to make the most efficient use of those resources available including state and federal grant money.

Table 1 shows the recommended adjustments for each customer class. The average system rate increase would be 5.1 percent. In addition, Table 2 shows the recommended

TACOMA POWER

TACOMA WATER

TACOMA RAIL

change to a customers power supply cost for every percent that the BPA SN CRAC is raised. The adjustment is applicable to the power service charges for the Contract Industrial Class and the energy charge for all other customers. The only exception is for flat-rate (non-metered) customers whose rates have not been unbundled. The adjustment will be applicable to the entire charge for those customers.

Table 1

**PROPOSED RATE ADJUSTMENT BY CLASS**

| Class | Rate Increase % |
|---|---|
| Residential | 5.0 |
| Small General Service | 4.1 |
| General Service | 4,7 |
| High Voltage General Service | 6.1 |
| Contract Power | 7.1 |
| Street & Highway Lighting | 7.9 |
| Traffic Signals | 11.9 |
| Private Lighting | 5.1 |

Table 2

**PROPOSED COST ADJUSTMENT CLAUSE**

| Class | Class Adjustment Factor |
|---|---|
| Residential | .585 |
| Small General Service | .586 |
| General Service | .554 |
| High Voltage General Service | .546 |
| Contract Industrial | .558 |
| Street Lighting (metered) | .580 |
| Street Lighting (flat) | .456 |
| Traffic Signals (flat) | .430 |
| Private Lighting (flat) | .346 |

We request your approval of the proposed rate adjustments.

Sincerely,

Mark Crisson

Mark Crisson
Director of Utilities

EXHIBIT "C"

Req. # 9448

# ORDINANCE NO. 27058

AN ORDINANCE pertaining to Electric Energy—Regulations and Rates; amending Chapter 12.06 of the Tacoma Municipal Code by amending Sections 12.06.160, 12.06.165, 12.06.170, 12.06.215, 12.06.225, 12.06.260, 12.06.290, 12.06.300 thereof; adding a new section thereto, to be known and designated as Section 12.06.318 pertaining to a Cost Adjustment Clause for power purchased from Bonneville Power Administration; establishing the effective date of March 31, 2003.

WHEREAS the City's Light Division (d.b.a. Tacoma Power) needs an electric rate adjustment in order to provide sufficient revenue to cover the costs of providing electric service to its customers, and

WHEREAS the Public Utility Board by Resolution U-9792 has recommended that the City Council approve an electric rate adjustment of approximately 5 percent system average, and

WHEREAS the proposed electric rate adjustment is determined to be just, fair, reasonable and sufficient, and in compliance with all laws; Now, Therefore,

BE IT ORDAINED BY THE CITY OF TACOMA:

Section 1. That Section 12.06.160 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.160 Residential service – Schedule A-1.**

A. Availability. Available for domestic purposes in residences, apartments, duplex houses and multiple family dwellings.

B. Applicability. To single residences, individually metered apartments and per apartment for collectively metered apartments.

C. Monthly Rate. The sum of the following customer, delivery and energy charges:

1. Energy: All energy measured in kilowatt-hours at $0.030349 per kWh.

2. Delivery: All energy delivered in kilowatt-hours at $0.027219 per kWh.

3. Customer Charge:

$5.50 per month or any fraction thereof for all but collectively metered apartments.

$4.50 per month or any fraction thereof for collectively metered apartments.

4. Exceptions:

(a) Within the City of Fircrest:

(1) Energy: All energy measured in kilowatt-hours at $0.032514 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.029160 per kWh.

(3) Customer Charge:

$5.89 per month or any fraction thereof for all but collectively metered apartments.

$4.82 per month or any fraction thereof for collectively metered apartments.

(b) Within the City of Lakewood:

(1) Energy: All energy measured in kilowatt-hours at $0.032514 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.029160 per kWh.

(3) Customer Charge:

$5.89 per month or any fraction thereof for all but collectively metered apartments.

$4.82 per month or any fraction thereof for collectively metered apartments.

(c) Within the City of University Place:

(1) Energy: All energy measured in kilowatt-hours at $0.032514 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.029160 per kWh.

(3) Customer Charge:

$5.89 per month or any fraction thereof for all but collectively metered apartments.

$4.82 per month or any fraction thereof for collectively metered apartments.

D. Service Conditions.

1. Where load conditions warrant, three-phase electric service may be made available by prior written agreement.

2. Applicable provisions of the Tacoma Municipal Code, General Provisions and Customer Service Policies governing the sale of electric energy shall apply.

Section 2. That Section 12.06.165 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.165 Low-income senior and/or low-income disabled discount residential service – Schedule A-2.**

A. Availability. Available for domestic purposes in residences, apartments, duplex houses and multiple family dwellings.

B. Applicability. To single residences and individually metered apartments. To Tacoma Power customers who:

1. a. Are 62 years of age or older, and have a maximum household annual income of not more than 150 percent of the poverty guidelines established by the U.S. Department of Health and Human Services (or its successor agency) as computed annually and published in the Federal Register; or

b. Receive Supplemental Security Income pursuant to 42 USC Section<u>s</u> 1381 through 1383; or

c. Are disabled and receive income from a disability program as a result of a disability that prevents working consistent with the requirements of 42 USC Section 401 <u>et seq.</u> and whose annual household income, together with all household members, does not exceed 150 percent of the poverty guidelines established by the U.S. Department of Health and

Human Services (or its successor agency) as computed annually and published in the Federal Register for the number of individuals in the household; and

2. Are a single occupant or the head of a household or the spouse of the head of the household; and

3. Reside in the dwelling unit; and

4. Are billed or are the spouse of a person billed by Tacoma Power; and

5. Customers who have been certified eligible by the authorized administering agency on or before March 31, 2003, and who have an active City of Tacoma Department of Public Utilities (d.b.a. Tacoma Public Utilities) utility account (prior to said date) shall be grandfathered pursuant to the prior income eligibility criteria until such account closes. If a customer closes the active account and does not reestablish a new account within ten business days, or if a customer has never applied for the discount rate, then the customer must apply in accordance with the hereinabove criteria.

Eligibility shall be certified by Tacoma Power in conjunction with the appropriate authorized administering organization. Each applicant shall be required to grant permission for a Tacoma Power home energy audit upon qualification for the low-income senior/disabled program.

C. Monthly Rate. 75 percent of the monthly bill as calculated under Section 12.06.160 of the Tacoma Municipal Code, known as Residential Service - Schedule A-1.

D. Service Conditions.

1. Where load conditions warrant, three-phase electric service may be made available by prior written agreement.

2. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy shall apply.

Section 3. That Section 12.06.170 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.170 Small general service - Schedule B.**

A. Availability. For nonresidential lighting, heating, and incidental power uses where a demand meter may be installed. The customer's actual demand as determined by Tacoma Power may not exceed 50 kilovolt amperes or total connected load as estimated by Tacoma Power may not exceed 65 kilowatts upon initial service energization.

B. Monthly Rate. The sum of the following customer, delivery and energy charges:

1. Energy: All energy measured in kilowatt-hours at $0.029822 per kWh.

2. Delivery: All energy delivered in kilowatt-hours at $0.030414 per kWh.

3. Customer Charge: $9.00 per month or any fraction thereof.

4. Exceptions:

(a) Within the City of Fircrest:

(1) Energy: All energy measured in kilowatt-hours at $0.031949 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.032583 per kWh.

(3) Customer Charge: $9.64 per month or any fraction thereof.

(b) Within the City of Lakewood:

(1) Energy: All energy measured in kilowatt-hours at $0.031949 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.032583 per kWh.

(3) Customer Charge: $9.64 per month or any fraction thereof.

(c) Within the City of University Place:

(1) Energy: All energy measured in kilowatt-hours at $0.031949 per kWh.

(2) Delivery: All energy delivered in kilowatt-hours at $0.032583 per kWh.

(3) Customer Charge: $9.64 per month or any fraction thereof.

C. Service Conditions.

1. The maximum allowable total connected motor rating is 7.5 horsepower (5.6 kilowatts) exclusive of motors of 1/4 horsepower and under for standard plug-in applications.

2. At the option of Tacoma Power, a customer may be transferred to a demand metered rate if the customer's actual demand has exceeded 50 kilovolt amperes at least three times in the prior 24-month period.

3. Power factor provision applicable.

4. Applicable provisions of the Tacoma Municipal Code, General Provisions and Customer Service Policies governing the sale of electric energy shall apply.

Section 4. That Section 12.06.215 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.215 General service - Schedule G.**

A. Availability. For general power use where a demand meter is installed, for standby capacity to customers generating all or a part of their electric power requirements, and for intermittent use. The customer's actual demand as determined by Tacoma Power must exceed 50 kilovolt amperes or total connected load as estimated by Tacoma Power must exceed 65 kilowatts upon initial service energization.

For customers providing all their own transformation from Tacoma Power's distribution system voltage, a discount for transformer investment and maintenance will be provided by reducing the monthly bill by 0.8 percent. For customers metered on the primary side of a transformer, a discount for

transformer losses will be provided by reducing the monthly bill by 1 percent. These discount percentages are additive, and not compounded.

B. Monthly Rate. The sum of the following customer, delivery and energy charges:

1. Energy: All energy measured in kilowatt-hours at $0.032063 per kWh.

2. Delivery: All kilowatts of Billing Demand delivered at $5.36 per kW.

3. Customer Charge: $46.00 per month or any fraction thereof.

4. Exceptions:

(a) Within the City of Fircrest:

(1) Energy: All energy measured in kilowatt-hours at $0.034350 per kWh.

(2) Delivery: All kilowatts of Billing Demand delivered at $5.74 per kW.

(3) Customer Charge: $49.28 per month or any fraction thereof.

(b) Within the City of Lakewood:

(1) Energy: All energy measured in kilowatt-hours at $0.034350 per kWh.

(2) Delivery: All kilowatts of Billing Demand delivered at $5.74 per kW.

(3) Customer Charge: $49.28 per month or any fraction thereof.

(c) Within the City of University Place:

(1) Energy: All energy measured in kilowatt-hours at $0.034350 per kWh.

(2) Delivery: All Kilowatts of Billing Demand delivered at $5.74 per kW.

(3) Customer Charge: $49.28 per month or any fraction thereof.

C. Billing Demand. Determined by means of a demand meter, 30-minute interval, reset monthly. The Billing Demand shall be the highest of:

1. The highest measured demand for the month adjusted for power factor;

2. 60 percent of the highest measured demand occurring during any of the preceding 11 months after adjustment for power factor; or

3. 100 percent of the standby capacity.

For purposes of the determination of Billing Demand in subsection 2 above, the 11 months of history shall be carried forward from the customer's previous account(s).

D. Standby Capacity. That amount of power requested by written application or estimated by the Director to be made continuously available for exclusive use of the customer.

E. Service Conditions.

1. At the option of Tacoma Power, primary metering may be installed where the service transformers aggregate 500 kVA or more.

2. At the option of Tacoma Power, a customer may be transferred to a non-demand metered rate if the customer's actual demand has not exceeded 50 kilovolt amperes in the prior 24-month period.

3. Power factor provision applicable.

4. Applicable provisions of the Tacoma Municipal Code, General Provisions and Customer Service Policies governing the sale of electric energy shall apply.

Section 5. That Section 12.06.225 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.225 High voltage general service – Schedule HVG.**

A. Availability. For general power use where a demand meter is installed and where a customer served does not require the use of Tacoma Power's distribution facilities other than substation transformation. For customers who provide all of their own transformation from Tacoma Power's transmission system voltage, a credit of 27.29 percent will be applicable to the delivery charge.

B. Monthly Rate: The sum of the following customer, delivery and energy charges:

1. Energy: All energy measured in kilowatt-hours at $0.029681 per kWh.

2. Delivery: All kilowatts of billing demand delivered at $3.78 per kW.

3. Customer Charge: $210.00 per month or any fraction thereof.

4. Exceptions:

(a) Within the City of Fircrest:

(1) Energy: All energy measured in kilowatt-hours at $0.031798 per kWh.

(2) Delivery: All kilowatts of Billing Demand delivered at $4.05 per kW.

(3) Customer Charge: $224.98 per month or any fraction thereof.

(b) Within the City of Lakewood:

(1) Energy: All energy measured in kilowatt-hours at $0.031798 per kWh.

(2) Delivery: All kilowatts of Billing Demand delivered at $4.05 per kW.

(3) Customer Charge: $224.98 per month or any fraction thereof.

(c) Within the City of University Place:

(1) Energy: All energy measured in kilowatt-hours at $0.031798 per kWh.

(2) Delivery: All kilowatts of Billing Demand delivered at $4.05 per kW.

(3) Customer Charge: $224.98 per month or any fraction thereof.

C. Billing Demand. Determined by means of a demand meter, 30-minute interval, reset monthly. The billing demand shall be the higher of:

1. The highest measured demand for the month adjusted for power factor; or

2. 60 percent of the highest measured demand occurring during any of the preceding 11 months after adjustment for power factor.

For purposes of the determination of Billing Demand in subsection 2 above, the 11 months of history shall be carried forward from the customer's previous account(s).

D. Service Conditions.

1. Power factor provision applicable.

2. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy shall apply.

Section 6. That Section 12.06.260 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.260 Contract industrial service - Schedule CP.**

A. Availability. For major industrial power use upon the execution of a written Power Service Agreement (Contract) with Tacoma Power, which shall require among other conditions:

1. A minimum Contract Demand (as set forth in the Contract) of not less than 8,000 kilowatts;

2. Delivery of power at one primary voltage;

3. Metering at primary voltage but in no case at less than nominal 4,160 volts;

4. Power factor adjustment to 95 percent lagging or better; and

5. Service is subject to curtailment and certain notice provisions are applicable.

B. Monthly Rate. The sum of the following power service, delivery, customer and other charges:

1. Power Service Charges:

(a) Energy: All Contract Energy (as set forth in the Contract) measured in kilowatt-hours at $0.022681 per kWh.

(b) Demand: All kilowatts of Billing demand delivered at $4.06 per kW.

(c) Minimum Charge: The Demand Charge.

(d) Contract Energy Overrun: All energy measured in excess of the Contract Energy (as set forth in the Contract) is subject to a Contract Energy Overrun charge, pursuant to the following formula:

Contract Energy Overrun Charge =

(MWh + Losses) x (THI + Tx) x 120%.

Where: MWh = the aggregate MWh over the day the customer's total measured daily load was above the Contract Energy amount; THI = the highest hourly price observed on the Tacoma Hourly Index within the day of overrun; Tx = applicable BPA or successor organization, transmission rate in

$ per MWh; Losses = MWh x 1.9%.

(e) Contract Demand Overrun: A Contract Demand Overrun charge shall be imposed when the total measured demand (highest 30-minute integrated demand) exceeds the Contract Demand (as set forth in the Contract). Said charge is pursuant to the following formula:

Contract Demand Overrun Charge = MW x 300% x DC

Where: MW = MW of metered Demand in excess of the Contract Demand; DC = Demand Charge.

2. Delivery: All kilowatts of Billing Demand delivered at $3.81 per kW.

3. Customer Charge: $760.00 per month or any fraction thereof.

C. Billing Demand. Determined by means of a demand meter, 30-minute interval, reset monthly.

1. The Billing Demand shall be the highest of:

(a) The highest measured demand for the month, adjusted for power factor;

(b) 60 percent of the highest measured demand occurring during any of the preceding 11 months after adjustment for power factor;

(c) A demand level equal to the Contract Energy, in average megawatt (as set forth in the Contract); or

(d) 60 percent of the highest Contract Demand (as set forth in the Contract) during any of the preceding 11 months.

D. Substation Credit. For customers who provide all of their own transformation from Tacoma Power's transmission system voltage, a credit of 21.31 percent will be applicable to the delivery charge.

E. Service Conditions.

1. Power factor provision applicable; and

2. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy and delivery services shall apply.

Section 7. That Section 12.06.290 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.290 Street lighting and traffic signal service - Schedule H-1.**

A. Availability: Available for:

1. Public street lighting service where the lighting system is in operation during hours of darkness and where the street light system and equipment is owned by the customer, or there have been other suitable prior written arrangements agreed to by Tacoma Power and the applicant; and

2. Traffic controllers, signal lights, warning lights, danger lights and similar uses, where the traffic control system and equipment is owned and maintained by the customer.

B. Monthly Rate: Rates stated herein are for (1) unmetered installations [items 1 and 2] where charges are per fixture and shall be applied to the number of installed units on the system as determined by Tacoma Power at the time the billing is rendered, and (2) metered installations [item 3].

1. Street Lighting Units (Unmetered):

a. Incandescent Lamps:

| Nominal Wattage | Energy Charge Per Unit |
|---|---|
| 0-150 Watts | $2.07 |
| 151-220 Watts | $3.01 |
| 221-320 Watts | $4.33 |
| 321-520 Watts | $7.06 |
| 521 & Over Watts | $10.08 |

b. High Intensity Discharge Lamps

**Energy Charge Per Unit**

| **Nominal Wattage** | **Continuous** | **Dusk to Dawn** | **Dusk to 2:20 a.m.** |
|---|---|---|---|
| 50 Watts | $1.89 | $0.96 | $ 0.59 |
| 70 Watts | $2.50 | $1.27 | $0.90 |
| 100 Watts | $3.61 | $1.86 | $1.26 |
| 150 Watts | $5.37 | $2.41 | $1.86 |
| 175 Watts | $5.63 | $3.01 | $1.95 |
| 200 Watts | $6.30 | $3.25 | $2.13 |
| 250 Watts | $8.11 | $3.99 | $2.81 |
| 310 Watts | $9.30 | $4.76 | $3.12 |
| 400 Watts | $12.41 | $6.43 | $4.24 |
| 700 Watts | $21.32 | $10.90 | $7.30 |
| 1000 Watts | $30.71 | $15.46 | $10.52 |
| 1500 Watts | $44.26 | $22.85 | $15.19 |

c. All lamps not listed above: Energy charge for lamp installations not listed in the above tabulations shall be at the rate of $ 27.40, $13.95, and $9.16 per month per kilowatt of total connected load for Continuous, Dusk to Dawn, and Dusk to 2:20 a.m. lamps, respectively.

2. Traffic Control Units (Unmetered):

| **Unit Type** | **Energy Charge Per Unit** |
|---|---|
| a. Red - Amber - Green | |
| Controllers....................... | $1.41 |
| Heads............................. | $1.87 |
| b. Flashing | |
| Controllers....................... | $0.44 |
| Heads............................. | $1.11 |

3. Street Lighting and Traffic Control Units (Metered): The sum of the following customer, delivery and energy charges:

a. Energy: All energy measured in kilowatt-hours at $0.026344 per kWh.

b. Delivery: All energy delivered in kilowatt-hours at $0.006458 per kWh.

c. Customer Charge: $6.00 per month or any fraction thereof.

C. Service Conditions. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy shall apply.

Section 8. That Section 12.06.300 of the Tacoma Municipal Code is hereby amended to read as follows:

**12.06.300 Private off-street lighting service - Schedule H-2.**

A. Availability. Available for high pressure sodium outdoor lighting service along private street and roadways, over parking lots, and for general area lighting of private property, but excluding public streets within the City of Tacoma.

B. Character of Service.

1. Lighting under this schedule shall be limited to the hours of darkness when street and highway lights are normally in use. The hours of use shall be regulated by a photoelectric control.

2. Tacoma Power will install, own, and maintain the equipment.

3. Energy will be provided on an unmetered basis.

C. Monthly Rate.

1. Lamps:

**Lamp Rating**

| **(Watts/Lamp)** | **Type** | **Rental Charge** |
|---|---|---|
| 100-Watt | Sodium Vapor | $9.68 |
| 200-Watt | Sodium Vapor | $12.28 |
| 400-Watt | Sodium Vapor | $19.64 |

2. Additional Equipment: Fixtures will be installed on existing poles. However, additional poles, wires, and accessories required for a lighting installation will be charged for in addition to the "Rental Charge." A maximum of

three poles will be allowed on any one installation. The customer shall pay the entire installation cost of $500.00 per pole at the time of installation.

3. For customers billed under low-income senior and/or low-income disabled discount residential service, Rate Schedule A-2, a discount will be provided by reducing the monthly bill by 25 percent.

D. Service Conditions. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy shall apply.

Section 9. That Chapter 12.06 of the Tacoma Municipal Code is hereby amended, by adding a new section to be known as Section 12.06.318, to read as follows:

**12.06.318 Power Purchased From Bonneville Power Administration -- Cost Adjustment Clause -- Schedule PPCAC**

The Bonneville Power Administration (BPA) is the primary basis for Tacoma Power's purchase of wholesale power. In the event that the BPA Administrator's Record of Decision implements a rate increase based on its Safety Net Cost Recovery Adjustment Clause (SN CRAC) for power purchased by Tacoma Power, all of Tacoma Power's retail rate schedules shall be adjusted and said adjustment shall become effective when the SN CRAC becomes effective for Tacoma Power. This adjustment shall be determined by the application of the below formula, be applied to all electric rate schedules and shall continue until during the period that said rate increase is applicable to Tacoma Power's purchases from BPA. The percentage used for the BPA rate

increase in the formula below represents the impact to Tacoma Power and is the effective percent increase that Tacoma Power experiences in the cost of its power purchases from the BPA. The formula is as follows:

Revised Charge= [1+ (BPA SN CRAC% x CAF)] x Charges for Adjustment

Where:

"SN CRAC" means BPA's Safety Net Cost Recovery Adjustment Clause,

"CAF" means Tacoma Power's Class Adjustment Factor, and

"Charges for Adjustment" means "Power Service Charges" for the Contract Industrial class, and "Energy" for all other classes except the non-metered rate classes, where this phrase means "all Monthly Rate charges".

The CAF for each 1 percent or portion thereof change in the BPA SN CRAC is shown in the table below:

| Customer Class | Applicable Rate Schedule | CAF |
|---|---|---|
| Residential | A-1, A-2 | 0.585 |
| Small General | B | 0.586 |
| General | G | 0.554 |
| High Voltage General | HVG | 0.546 |
| Contract Industrial | CP | 0.558 |
| Street Lighting (metered) | H-1 | 0.580 |
| Street Lighting (flat) | H-1 | 0.456 |
| Traffic Signals (flat) | H-1 | 0.430 |
| Private Street Lighting (flat) | H-2 | 0.346 |

The adjustment set forth in this schedule shall be applied and be immediately effective when the BPA SN CRAC is effective for Tacoma Power's wholesale power purchases from the BPA.

Section 10. Tacoma Power's previous electric rate adjustment ordinance, Substitute Ordinance No. 26848 at Section 22 provided to the effect that the rate adjustment took into account that Tacoma Power deferred about $54 million in purchased power cost in order to meet revenue bond coverage covenants, and this amount was amortized with available revenues over 36 months. Therefore, said amortization period shall continue until October 1, 2004, and it is the intent of the Public Utility Board to adjust rates if necessary to ensure that the deferred power costs are so amortized.

Section 11. That this ordinance shall be effective March 31, 2003.

Passed: MAR 18 2003

Mayor

Attest:

City Clerk

Approved as to form & legality:

~~Chief Assistant~~ City Attorney

Requested by Public Utility Board
Resolution No. U-9792

EXHIBIT "D"

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 62D AIRLIFT WING (AMC)

25 August 2003

City of Tacoma
Department of Public Utilities
Light Division
3628 South 35th Street
Tacoma WA 98411

62d Contracting Squadron
ATTN: LGCB (N. Molfino)
1197 A. Street, Room 10
McChord AFB WA 98438-0178

SUBJECT: 2003 Rate Increase of Contract F45603-73-C-0009

The purpose of this letter is to provide a copy of the Position Paper prepared by our consultant and presented at the 29 July negotiations. The Air Force does not agree to burden the costs resulting from the return of the Contract Power customers to the melded portfolio. The Air Force also expects the demand and energy charges be based on their cost. These revisions will amount to approximately $91,000 and change McChord's rate increase to 4.7%.

We appreciate Tacoma Power's assistance and cooperation to date, and we look forward to TPU's continued cooperation during the remainder of the negotiations process. Please contact Ms. Natalie Molfino, at (253) 982-3873 or natalie.molfino@mcchord.af.mil, with any questions.

Sincerely,

JOYCE GRODA
Contracting Officer

# City of Tacoma
# Public Utilities Board
# Proposed Rate Increase
# to
# McChord Air Force Base and
# Fort Lewis

## Position on Cost Consequences
## to Portfolio Service HVG Rates
## Related to the Return of
## Contract Power Customers
## and
## HVG Rate Design

**Prepared Under**
**Contract No. F8637-02-D-6998**
**Delivery Order No. 00012**

**August 18, 2003**

EXETER
ASSOCIATES, INC.
5565 Sterrett Place
Suite 310
Columbia, Maryland 21044

EXETER

ASSOCIATES, INC.
5565 Sterrett Place
Suite 310
Columbia, Maryland 21044

**Federal Executive Agencies**

**Position on Issues**

**August 2003**

In the mid-1990's after an extensive and thorough proceeding, certain TPU Contract Power customers were authorized to cease service under TPU's standard (i.e., melded) Portfolio Service rates, and commence service under a progressive, new, market based retail service provided at Non-Portfolio rates. The Council of the City of Tacoma ("Council") agreed with their Public Utilities Division that the opportunity to purchase market-based power would subject the departing customers to greater price and market risks while reducing their total power supply costs. Non-Portfolio Power Service was effectuated by Council approval of an Addendum to the CP customers' service contracts. The Non-Portfolio Power Service Addendum approved by the; Council states that "...Tacoma and its other customers shall not bear any uncompensated cost, including stranded investment, arising from Tacoma's provision of Non-Portfolio Power Service to the Company; Tacoma will take all reasonable steps to ensure that any new service has no adverse impact on all other electric rate payers." Also, "...to the extent that the Company wishes henceforth to convert to Portfolio Power Service a portion of its Non-Portfolio Load, Tacoma cannot guarantee future service under Tacoma's Schedule CP, or other equivalent firm power rate based on Tacoma's melded resource portfolio. At the Company's request, Tacoma will provide firm power service, but the rate for such service may be based on resources other than Tacoma's melded resource portfolio rate."

At a September 10, 2002 Joint Public Utility Board/Tacoma City Council Study Session, the Board and City Council reversed the above-stated policy and ruled in favor of a policy that returned the CP customers to the melded portfolio. This policy reversal decision, made prior to meaningful public input or customer negotiations, added $8 million to TPU's Portfolio Service revenue deficiency, increasing that deficiency from $16.9 million to $24.9 million. For the following reasons, McChord AFB objects to the payment of rates which are based, in part, on the inclusion of the $8 million Portfolio Service rate impact that is related to the Public Utility Board/City Council policy reversal regarding the provision of Portfolio Service to the returning CP customers.

1. <u>Failure to Negotiate</u>.

The rates determined by TPU to be applicable to McChord AFB are presented *fait accompli*. TPU defends the rates it would apply to McChord/Fort Lewis as having survived the City's regulatory process, which provides a mechanism for *other* parties to be heard. There have been no negotiations in arriving at the rates determined appropriate by the Utility Division and the Tacoma City Council. McChord's electric service contract with the TPU requires that rate changes be accomplished through negotiations. Unilateral rate change determinations are not consistent with the TPU/McChord electric service contract. City council approval, and presentation of *fait accompli* rates to McChord AFB, without benefit of negotiations violates McChord's contractual rights to negotiate the rates.

2. Violation of Cost-Based Ratemaking Precepts.

Serving the returning CP customers from TPU's melded portfolio of power acquisition costs violates cost-based ratemaking principles. Rates should be cost based. TPU routinely performs a cost of service study to identify class costs of service and sets rates based on the identified costs. TPU has identified an increase of $8 million in melded Portfolio Service costs directly associated with return of the CP customers to that service. This Portfolio Service cost increase is caused by the return of the CP customers to melded Portfolio Service, and belongs to the returning CP customers. Including these costs in Portfolio Service rates paid by all customers, including McChord AFB and Fort Lewis, violates cost-based ratemaking principles.

3. Procedural Infirmities.

The Tacoma PUB and City Council reversed policy and determined the issue of allowing the returning CP customers to be served from the melded portfolio prior to meaningful public input or required negotiations with TPU customers. The issue was for all practical purposes settled in the September 2002 joint PUB/City Council study session, prior to the January - March 2003 scheduled public input sessions. Generally, parties proposing a change from the status quo (i.e., CP customers served at Non-Portfolio rates) bear the burden of demonstrating that the status quo is no longer reasonable and the proposed change is, in fact, reasonable. Here, the PUB/City Council, on their own volition, decreed a major policy change at the beginning of the regulatory process, without a case being made for the policy reversal and opportunity for parties to respond to any such proposal. McChord objects to paying rates adverse to its own and

other customers' interests emanating from a defective, decided-before-the-facts procedure.

4. No PUB Staff Input after September 2002 Study Session.

Having gotten its marching orders to roll the returning CP customers back into the melded Portfolio Service rates, the PUB Staff would not reasonably be expected to perform a usual Staff function of creating a record on an issue the regulatory authorities would especially like to see addressed. Normally, a regulatory authority interested in addressing an issue would direct its Staff to participate in creating a record sufficient to support a determination of findings of facts at the end of the regulatory process. Here, with the PUB/City Council having reached its own findings, and conclusions and having ordered its Staff to prepare its case on the basis of returning CP customers to the melded Portfolio Service, it is unrealistic to then expect Staff to pursue an antithetical view as the regulatory process unfolds. It is not unusual, indeed it is expected, that Staff will address policy issues over the course of regulatory proceedings. Staff's being trumped out of participation on this issue by its own regulatory authorities at the beginning of the process, effectively precluded creation of a full and substantial record on this issue.

5. Nebulous Benefits.

In support of the $8 million rate break granted to the CP customers through application of Portfolio Service rates, PUB Staff cites benefits related to a more viable Tacoma community and employment benefits. The proposed allocation of the $8 million Portfolio Service cost increase, which is directly related to the return of the CP customers, to all other customers, does not necessarily produce benefits associated with a more viable community. This is especially so when it is realized that this same $8 million cost allocated to TPU's general ratepayers, could have been spent by TPU's customers on myriad other products and services provided by other Tacoma businesses. Similarly, any claims of greater employment when several select businesses have their electricity procurement costs reduced by allocating costs they are responsible for to other ratepayers, leaving ratepayers with fewer dollars to spend on goods and services provided by other Tacoma businesses may not, in fact, lead to more employment opportunity at all.

6. No Benefit/Cost Analysis to Justify an $8 million Real Cost Increase.

At issue is not just who should pay for an $8 million portion of a given, constant, Portfolio Service cost. Rather, return of the CP customers will, in both nominal and real terms, increase Portfolio Service costs by $8 million. Thus, any alleged benefits related to the $8 million Portfolio Service cost increase, which is directly related to and logically is the responsibility of the returning CP customers, would have to exceed $8 million for there to be any net benefit. It simply is not enough to argue that there may be *some* (nebulous) benefit to the Tacoma community by having general ratepayers take on an additional $8 million burden associated with giving an $8 million benefit to returning CP

customers. Net community benefits will only begin to appear if total community benefits are shown to exceed the $8 million real cost increase to general ratepayers. There has been no submission of a Benefit Cost Study in these proceedings related to the PUB/City Council policy reversal which allows the returning CP customers to receive Portfolio Service.

7. Violation of the Allocation of Risk to CP Customers and Acceptance of that Risk by CP Customers.

To assist members of the Public Utility Board, the Mayor, and City Council members in their deliberations allowing the CP customers to exit Portfolio Service rates at the 23 July 1996 Council Meeting, Tacoma Public Utilities prepared and submitted a letter dated 15 July 1996 which discussed the proposal to authorize the conversion of a substantial portion of the CP customer load to Non-Portfolio Service. In that letter, the regulators were told that the CP customers believe that by assuming greater price and market risks, they can reduce their total power supply costs. The City Council relied upon, and in fact, quoted in their Resolution No. U-920I, this assumption of greater price and market risk by the CP customers in authorizing the new Non-Portfolio Service.

There are three risks the CP customers agreed to assume upon converting their loads from Portfolio Service to Non-Portfolio Service:

1. **The risk of paying more at the time of conversion.** CP customers did not face this risk, as the Council found the CP customers could reduce their total power supply costs by converting their load to Non-Portfolio Service.

2. **The risk of paying more under the market based Non-Portfolio Service, should market prices move unfavorably after conversion.** The CP customers have revealed their unwillingness to experience the consequences of this risk after their exit from Portfolio Service by abandoning electric procurement service at market prices.

3. **The risk of paying more for power, under the City's policy that other customers not bear any uncompensated cost or adverse impact related to TPU offering and the CP customer accepting Non-Portfolio Service, should the CP customers ever decide to reverse their initial decision to convert loads to Non-Portfolio Service.** TPU and the Council propose to shield the returning CP customers from this risk by now extending to the returning CP customers Portfolio Service pricing.

Thus, the CP customers faced no risk when they left Portfolio Service; revealed their unwillingness to continue to face price and market risks when they were outside of Portfolio Service; and now TPU, at the direction of the City Council, removes the risk, willingly accepted by the CP customers, of paying higher market prices upon their return to Portfolio Service.

The upshot of relieving the CP customers of the price and market risk they willingly accepted at the time of the Board and Council approval and customer conversion to the Non-Portfolio Service offering is to make the decision to convert load to Non-Portfolio Service a risk-free decision to the CP customers. The CP customers are offered the opportunity to choose the timing of their conversion to Non-Portfolio Service to those periods when market prices are below Portfolio Service prices, and under the reversed return policy, the CP customers can return to Portfolio Service when market prices increase adverse to their interests. Implementation of such a policy is simply not fair to TPU's other electric customers who did not pursue, or were not authorized to pursue, competitive electricity procurements.

Also, while the TPU Board and City Council can eliminate risk to the CP customers by allowing those customers to exit Portfolio Service when market prices are favorable and return to Portfolio Service when market prices are high, the Board and Council cannot eliminate the risk, but can only shift that risk to other non-CP customers. The $8 million higher energy requirement procurement costs associated with returning customers is not eliminated by ending the applicability of Non-Portfolio Service, but the $8 million cost is simply shifted to all current Portfolio Service customer through their increased electric service rates. The cost consequences related to the heads-I-win-tails-you-lose risk treatment extended to the returning CP customers should not be transferred to all other customers on the TPU system including McChord AFB and Ft. Lewis, but should remain with the returning CP customers.

8. Not Appropriate to Compete with Oneself.

Allowing the Returning CP customers to receive Portfolio Service affords them an $8 million rate break (to the detriment of all other customers). One has to ask, Why? Where is cheaper in-state power available? Where is cheaper out of state power available? TPU's Current Status Annual Electric Bill Comparison included in its filing shows Puget Sound Energy, Seattle City Light, and Snohomish Co. PUD rates to be 30 percent to 50 percent higher than TPU's larger customer rates. Can the returning CP customers qualify for a direct allocation of public preference power? Not likely. What in-state or out of state investor owned utilities, whose rates are set on the assumption that their earnings are subject to corporate income taxes, have rates lower than TPU's? What information regarding alternate energy source prices did the Tacoma PUB and City Council have when they reversed their returning CP customer policy at the beginning of this rate setting procedure? Absent clear, convincing evidence that TPU, in fact, faced competitive threats to its electric service rates, it appears that TPU was merely competing with itself in granting the $8 million rate break to the returning CP customers.

9. Applicability of the "Non-guarantee" of Portfolio Service Rate returning CP customers.

TPU Staff cites that the non-Portfolio Service Addendum language, while it does not guarantee applicability of Portfolio Service rates to returning CP customers, is not an iron-clad requirement that the Portfolio Service rate absolutely will not be extended to returning CP customers. The "cannot guarantee" language only makes sense, when read in the full context of Resolution No. U-9201' s treatment of costs and risks, if it prohibits the extension of Portfolio Service rates to returning CP customers should such extension adversely affect TPU's other

customers. Only two possibilities attend the return of the CP customers: either Portfolio Service rates will go down; or Portfolio Service rates will go up. If Portfolio Service rates would go down, it would be foolish to not welcome returning CP customers back to Portfolio Service. The "cannot guarantee service under Tacoma's Schedule CP" language provides for this possibility. The "cannot guarantee" language, when read in the context of all the cost protections that were granted to other customers coincidentally with the approval of Non- Portfolio Service, comes into play if extending Portfolio Service to returning CP customers would adversely affect other customers. The plain language of Resolution No. U-9201 and the Non-Portfolio Power Service Addendum, and a fair reading of the plain meaning and application of the "cannot guarantee" language does not create a loophole to now saddle other customers, including McChord AFB and Fort Lewis, with an $8 million cost attendant to extending Portfolio Service to the returning CP customers.

10. <u>Inappropriate Exporting of Cost Consequences Related to Extending the $8 million Rate Benefit to Returning CP Customers</u>.

For whatever presumed community benefits, in September 2002 the Tacoma City Council decided to reduce the rates of two CP customers by $8 million (and increase general ratepayer rates correspondingly) by reversing its earlier decision and allow the CP customers to return to Portfolio Service. The Council has political jurisdiction over City residents and business, and rate setting jurisdiction over ratepayers located in the City and its environs. The City's ratemaking authority should not be used to subsidize several select customers by transferring the cost consequences of their unsuccessful business decision to leave TPU's Portfolio Service, only to return when they can foist $8 million of costs related to the

procurement of power for their needs onto other customers. It is not reasonable to mitigate the cost effect on City ratepayers, which was incurred in order to achieve employment or other community benefits for the City of Tacoma, by exporting a portion of that cost to utility service customers located in the City's environs.

In the area of rate design, the demand and energy rates applicable to McChord AFB and to Fort Lewis should be based on demand and energy costs. McChord AFB and Fort Lewis pay rates under the HVG rate schedule of service. These rates contain both a demand charge and an energy charge. The demand charge is set below cost and the energy charge is set above cost. HVG customers are large, sophisticated users of electricity who understand the basis of demand and energy charges. There simply is no reason to set demand and energy rates at other than cost. No other class rates would be affected by this change.

W:\5212\rag\Fed Exec Agencies.doc

EXHIBIT "E"

GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1

| 1. AMENDMENT/MODIFICATION NO. | 2. EFFECTIVE DATE | 3. REQUISITION/PURCHASE REQUEST NO. | 4. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00003 | 80 JAN 01 | FQ44793520003 | |

**5. ISSUED BY** CODE

BASE CONTRACTING OFFICE
P.O. BOX 4178
McCHORD AFB, WA 98438
ATTN: S. PASCOE, LGCV, 984-2531

**6. ADMINISTERED BY** *(If other than block 5)* CODE

**7. CONTRACTOR NAME AND ADDRESS** CODE FACILITY CODE
*(Street, city, county, state, and ZIP Code)*

CITY OF TACOMA
DEPT. OF PUBLIC UTILITIES
LIGHT DIVISION
P.O. BOX 11007
TACOMA, WA 98411

**8.**
☐ AMENDMENT OF SOLICITATION NO. ______
DATED ______ *(See block 9)*
☒ MODIFICATION OF CONTRACT/ORDER NO. F45603-73-C0009
DATED 20 NOV 72 *(See block 11)*

**9. THIS BLOCK APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in block 12. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation, or as amended, by one of the following methods:

(a) By signing and returning ______ copies of this amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If, by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided such telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**10. ACCOUNTING AND APPROPRIATION DATA** *(If required)*

N/A

**11. THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS**

(a) ☐ This Change Order is issued pursuant to ______
The Changes set forth in block 12 are made to the above numbered contract/order.

(b) ☐ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in block 12.

(c) ☒ This Supplemental Agreement is entered into pursuant to authority of GENERAL PROVISION 3, "CHANGE OF RATES"
It modifies the above numbered contract as set forth in block 12.

**12. DESCRIPTION OF AMENDMENT/MODIFICATION**

ADDENDUM NOs. 4 AND 5 ARE HEREBY INCORPORATED IN THEIR ENTIRETIES AND BECOME A PART OF THE CONTRACT AS FOLLOWS:

(a) SECTION II, GENERAL PROVISION 2: DELETE TACOMA CITY LIGHT PRIMARY POWER RATE SCHEDULE E-4, DATED JANUARY 5, 1975, AND INCORPORATE TACOMA CITY LIGHT PRIMARY POWER RATE SCHEDULE E-2, DATED JANUARY 1, 1979. EFFECTIVE DATE IS 79 JAN 01.

(b) SECTION II, GENERAL PROVISION 2: DELETE TACOMA CITY LIGHT PRIMARY POWER RATE SCHEDULE E-2, DATED JANUARY 1, 1979, AND INCORPORATE TACOMA CITY LIGHT PRIMARY POWER RATE SCHEDULE E-2, DATED JANUARY 1, 1980. EFFECTIVE DATE IS 80 JAN 01.

(c) PARAGRAPHS 1, 2 AND 3 OF ADDENDUM NO. 2 DATED 78 JAN 13, ARE DELETED IN THEIR ENTIRETIES AND ARE REPLACED BY THE FOLLOWING:

"1. CONTRACT ESTIMATED MONTHLY DEMAND OF 14,000 KW SHALL BE CHANGED TO 15,700 KW.

2. CONTRACT ESTIMATE OF ANNUAL CONSUMPTION OF 80,000,000 KWH SHALL BE CHANGED TO 80,900,000 KWH.

Except as provided herein, all terms and conditions of the document referenced in block 8, as heretofore changed, remain unchanged and in full force and effect.

**13.** ☐ CONTRACTOR/OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT ☒ CONTRACTOR/OFFEROR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 2 COPIES TO ISSUING OFFICE

| 14. NAME OF CONTRACTOR/OFFEROR | 17. UNITED STATES OF AMERICA |
|---|---|
| CITY OF TACOMA, Dept. of Public Utilities, Light<br>[signature]<br>(Signature of person authorized to sign) | BY [signature]<br>(Signature of Contracting Officer) |

| 15. NAME OF TITLE OF SIGNER *(Type or print)* | 16. DATE SIGNED | 18. NAME OF CONTRACTING OFFICER *(Type or print)* | 19. DATE SIGNED |
|---|---|---|---|
| Mike Parker, Mayor | 7/1/80 | C. L. WILK | 80 APR 07 |

30-101

Approved as to form & legality: [signature]
Chief Asst. City Atty

MODIFICATION P00003 to F45603-73-C0009 (Continued)

3. CONTRACT ESTMATE OF ANNUAL COST OF $495,000 SHALL BE CHANGED TO $655,000."

(d) Date of General Provision No. 8, Definitions, is changed to read "(1979MAR/DAR 7-103.1)".

(e) General Provision No. 10, Disputes, is deleted and replaced by the following:

"10. DISPUTES

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601, et. seq.). If a dispute arises relating to the contract, the contractor may submit a claim to the Contracting Officer who shall issue a written decision on the dispute in the manner specified in DAR 1-314 (FPR 1-1.318).

(b) "Claim" means

(1) a written request submitted to the Contracting Officer;
(2) for payment of money, adjustment of contract terms, or other relief;
(3) which is in dispute or remains unresolved after a reasonable time for its review and disposition by the Government; and
(4) for which a Contracting Officer's decision is demanded.

(c) In the case of disputed requests or amendments to such requests for payment exceeding $50,000, or with any amendment causing the total request in dispute to exceed $50,000, the contractor shall certify, at the time of submission as a claim, as follows:

> I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, and that the amount accurately reflects the contract adjustment for which the contractor believes the Government is liable.

______________________
(Contractor's Name)

______________________
(Title)

(d) The Government shall pay the contractor interest

(1) on the amount found due on claims submitted under this clause;
(2) at the rates fixed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41;
(3) from the date the Contracting Officer receives the claim, until the Government makes payment.

(e) The decision of the Contracting Officer shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency unless an appeal or action is timely commenced within the times specified by the Contract Disputes Act of 1978.

(f) The contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action related to the contract, and comply with any decision of the Contracting Officer."

(f) Date of General Provision No. 18, Equal Opportunity, is changed to read: "(1978 SEP/DAR 7-103.18(a))."

(g) General Provision No. 20, Payment of Interest on Contractors' Claims, is deleted in its entirety.

(h) NOTE: Addendum No. 3 was never issued nor made a part of the contract.

(i) APPROVAL OF CONTRACT (1949 JUL/DAR 7-105.2)
This contract shall be subject to the written approval of the Secretary or his duly authorized representative and shall not be binding until approved.

4 Atchs
1. Addendum No. 4 (1 page)
2. Addendum No. 5 (1 page)
3. Schedule E-2 Effective January 1, 1979 (1 page)
4. Schedule E-2 Effective January 1, 1980 (1 page)

EXHIBIT "F"

TACOMA POWER

3628 South 35th Street

Tacoma, Washington 98409-3192

TACOMA PUBLIC UTILITIES

January 16, 2004

Ms. Joyce Groda
Contracting Officer
62d Contracting Squadron
1197 A. Street, Room 10
McChord AFB WA 98438-0178

SUBJECT: 2003 Rate Increase of Contract F45603-73-C-0009

Dear Ms. Groda:

We are in receipt of your letter of December 18, 2003, which states that it contains the Contracting Officer's final decision with respect to the 2003 rate increase for Contract F45603-73-C-0009 and further advises Tacoma Power with respects to its appeal rights regarding that decision.

Review of the contract indicates that the section you refer to in your letter states as follows:

"10. DISPUTES

a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601, et. seq.). If a dispute arises relating to the contract, the contractor may submit a claim to the Contracting Officer who shall issue a written decision on the dispute in the manner specified in DAR 1-314 (FPR 1-1.318).

b) "Claim" means
   1) a written request submitted to the Contracting Officer;
   2) for payment of money, adjustment of contract terms, or other relief;
   3) which is in dispute or remains unresolved after a reasonable time for its review and disposition by the government; and
   4) for which a Contracting Officer's decision is demanded."

We understand this provision to require that we submit a written claim for relief and that you need to make a final determination with respect to that claim before we can use the Disputes clause of the contract to proceed further.

Our understanding of the situation at the time of our letter of October 30, 2003 is that we were engaged in the process of negotiation pursuant to the change of rates provision of the contract and that we had offered the Air Force a compromise solution to the apparent impasse. We did not submit to the contracting officer a claim under Section 10 requesting a written decision at that time, though your letter of December 18, 2003 stated that you were making such a final determination.

For the purposes of clarification and to ensure compliance with the terms of the contract and the Contract Disputes Act, this letter will now officially submit for your consideration the claim as set forth herein.

The City adopted a rate increase in 2003 and pursuant to the provisions of the contract Tacoma Power requested that the Air Force accept the new rate. The Air Force declined to pay the new rate and further negotiations occurred. Those negotiations are now apparently at an impasse.

The issue as we understand it is that the Air Force objects to the rate because it includes costs associated with the decision to allow certain contract customers to return most of their load to a melded portfolio rate collected from all rate classes. The Air Force contends that the correct rate making decision would have been to require that all such costs be recovered from the returning contract customers. This in the Air Force's view renders the rate not a cost of service rate and hence unfair to the Air Force.

Tacoma Power's view of the matter differs in that, all utilities are required to make certain policy decisions regarding their resources. These policy decisions ought not to be subject to a veto through the rate negotiation provision of the contract. After careful review of your consultant's comments and as noted in our September 17, 2003 letter, we conclude that our proposed rates are cost of service based. Serving all customers from a melded resource portfolio is consistent with generally accepted rate making practice.

As noted above, Tacoma Power feels that the 2003 adopted rates are cost based and do not harbor interclass subsidy. We would point out, however, that the potential existence of interclass subsidies in a rate is not generally prima facie evidence of unfairness. Rates throughout the western United States, as endorsed by state utility commissions, have contained such subsidizations driven by policy considerations , and have authorized subsidized rates for residential, agricultural and rural customers for decades. The Air Force in those jurisdictions has accepted such rates on previous occasions and not asserted that they were not cost based rates. The Air Force conclusion regarding rate making principles that apply ought not to be altered simply because Tacoma Power's rates are not reviewed by a state utility commission. If the principle is the same, the Air Force ought to accept it. Otherwise the City must present its case for the rate to the authorities as constituted in the contract. This unequal treatment of Tacoma Power's rate as undeserving of the same consideration as that of a for profit private utility company rate is arbitrary and capricious.

Also you should consider that the adopted 2003 rates are approximately equal to those which would have been developed had the Contract Power customers never opted for non-portfolio service and remained retail portfolio customers. Further, the potential for the CP customers to return to portfolio service under new contracts was recognized when the CP customers opted for non-portfolio service for most of their load.

The position that the Air Force takes with respect to regulators' policy decisions is that the Air Force, out of all customers, is not subject to the effects of such occurrences, if they determine that they don't wish to be impacted. On this theory the Air Force could as easily object to any

cost incurred by the utility and decline to pay its share of the costs of such decisions, thereby imposing them on others. The Air Force benefits from the City's electric utility and its low rates, which is the sum total of many policy decisions taken over many years. If the Air Force can pick and choose among the policy decisions they will support and pay for in their rates, they certainly will foster an inequitable result for the rest of Tacoma Power's customers. This is ultimately contrary to the intent behind the change of rates clause in the contract.

The Air Force position would convert the negotiations mechanism in the contract into a veto over any and all matters of utility policy. This position is arbitrary and capricious because it does not even consider the ratemaking principles applied in this instance. Tacoma Power's adopted 2003 rate is a cost of service rate because it has been developed using generally accepted ratemaking practice as noted above. Rates must be just, fair, reasonable and sufficient. Rates based on principles and practices similar to those followed by Tacoma power have been upheld as fair, just and reasonable by state commissions under the presumption that ultimate benefits outweigh the perceived individual inequities. The Air Force position simply has the impact of avoiding a cost that should be shared by all rate payers.

Based on this negotiations impasse we therefore ask you to reconfirm the Contracting Officer's final decision so that we may proceed to resolve this dispute in accordance with the provisions of the agreement.

Sincerely,

George Whitener

George Whitener
Power Manager

EXHIBIT "G"

TACOMA POWER
3628 South 35th Street
Tacoma, Washington 98409-3192
TACOMA PUBLIC UTILITIES

March 8, 2004

Ms. Joyce Groda
Contracting Officer
62nd Contracting Squadron
1197 A. Street, Room 10
McChord AFB WA 98438-0178

SUBJECT: 2003 Rate Increase of Contract F45603-73-C-0009

Dear Ms. Groda:

Reference Tacoma Power's letter dated January 16, 2004, subject as above. We have been advised by Ms. Natalie Molfino, MAFB Contracting Office that in conjunction with Tacoma Power's written claim as submitted in our January 16, 2004 letter, Tacoma Power must also submit a certification along with the claim in accordance with section 10. (c) of the contract.

Since the effective date of the March 31, 2003 rate increase, and as of monthly billings through February 2004, Tacoma Power's billing experience with McChord AFB reflects the following:

| | |
|---|---|
| Amount billed March 2003 – February 2004: | $3,392,793.72 |
| Amount paid by MAFB April 2003 – February 2004: | $2,912,630.31 |
| Amount claimed: | $ 480,163.41 |

Accordingly, the following certification is provided to be used in conjunction with the written claim as stated in Tacoma Power's January 16, 2004 letter:

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount accurately reflects the contract adjustment for which the contractor believes the Government is liable:

George Whitener
(George Whitener)

Power Manager

Sincerely,

George Whitener
George Whitener
Power Manager

bcc: J. Curley
PM Files

CHONA L. LILOC
COMMISSION EXPIRES
NOTARY PUBLIC
1-29-05
STATE OF WASHINGTON

Chona L. Liloc
3/8/04

EXHIBIT "H"

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 62D AIRLIFT WING (AMC)

1 April 2004

RECEIVED
APR 05 2004
POWER MANAGEMENT

City of Tacoma
Department of Public Utilities
Light Division
3628 South 35th Street
Tacoma WA 98411

62d Contracting Squadron
ATTN: LGCB (N. Molfino)
1197 A. Street, Room 10
McChord AFB WA 98438-0178

SUBJECT: 2003 Rate Increase of Contract F45603-73-C-0009

Enclosed is modification number P00024 to the subject contract. This modification serves as the final decision of the Contracting Officer in the matter of the disputed rate increase, which was effective 31 March 2003, and authorizes retroactive payment of amounts withheld at an accepted rate.

We received your certified claim dated 8 March 2004. Please note that $304,559.34 of the amount claimed by Tacoma Power applies to the February 2004 invoice, and $287,301.76 of this was paid on 16 March 2004. The remaining amounts are addressed in the enclosed modification.

The undisputed portion of the amounts withheld, which totals $120,859.97, will be paid after receipt of a proper invoice.

If you have any questions regarding this matter, please contact Natalie Molfino, at (253) 982-3873 or natalie.molfino@mcchord.af.mil. We appreciate Tacoma Power's efforts in these negotiations.

Sincerely,

LORI J. HOUGHTON
Contracting Officer

AMC-GLOBAL REACH FOR AMERICA

1.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | | |
|---|---|---|---|
| 1. CONTRACT ID CODE: J | PAGE OF PAGES: 1 of 3 | | |
| 2. AMENDMENT/MODIFICATION NO. P00024 | 3. EFFECTIVE DATE 01-Apr-2004 | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO.(If applicable) |
| 6. ISSUED BY CODE FA4479<br>62 CONS/LGCB - NATALIE MOLFINO<br>PO BOX 4178<br>1197 A STREET<br>MCCHORD AFB WA 98438 | | 7. ADMINISTERED BY (If other than item 6) CODE<br>See Item 6 | |

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
CITY OF TACOMA, DEPT OF PUBLIC
3628 SO 35TH STREET
P O BOX 11007
TACOMA WA 98411

CODE 0CD14 FACILITY CODE 0CD14

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MOD. OF CONTRACT/ORDER NO. F45603-73-C-0009
X 10B. DATED (SEE ITEM 13) 20-Nov-1972

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

☐ A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

☐ B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

☐ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

X D. OTHER (Specify type of modification and authority)
UNILATERAL - General Provision No. 3, Change of Rates, and General Provision No. 10, Disputes.

E. IMPORTANT: Contractor [X] is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE SUMMARY OF CHANGES

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>Lori J. Houghton, Contracting Officer | |
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY [signature]<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>01-Apr-2004 |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

a. The purpose of this modification is to issue the Final Decision of the Contracting Officer, to reimburse the City of Tacoma for undisputed amounts withheld from payment for electric utility service from 31 March 2003 through 29 February 2004, and to incorporate a 4.7% rate increase, in response to attached City of Tacoma Ordinance No. 27058, 2 pages.

b. Schedule HVG, High Voltage General Service, effective March 31, 2003 is hereby incorporated into the contract, at the following accepted rates:

Energy – All energy measured in kilowatt-hours at $0.031046 per kWh.
Delivery – All kilowatts of Billing Demand delivered at $2.51 per kW.
Customer Charge - $62.82 per month or any fraction thereof.

This rate increase applies to all billings for electricity since 31 March 2003. In Section II, General Provision No. 2 entitled "Rates and Charges", Tacoma Power Rate Schedule HVG, High Voltage Service, effective October 1, 2001 is replaced by Tacoma Power Schedule HVG, High Voltage General Service, effective March 31, 2003.

c. As a result of the inclusion of this HVG rate schedule, the undisputed portion of the monies withheld applicable to this rate schedule are now payable. Retroactive payment of $120,859.97, representing the amount accepted for payment is authorized.

The following is a summary of amounts withheld from payment and amounts to be paid at the accepted rate increase of 4.7%:

| Month of Service | Amount Invoiced | Amount Paid | Amount Withheld | Amount Denied | Amount Accepted |
|---|---|---|---|---|---|
| 31 March 2003 | $ 287,320.61 | $ 286,661.36 | $ 659.25 | $ 246.12 | $ 413.13 |
| April 2003 | $ 280,948.09 | $ 261,044.93 | $ 19,903.16 | $7,430.51 | $12,472.65 |
| May 2003 | $ 264,506.61 | $ 245,787.99 | $ 18,718.62 | $6,988.28 | $11,730.34 |
| June 2003 | $ 246,365.52 | $ 229,518.51 | $ 16,847.01 | $6,289.55 | $10,557.46 |
| July 2003 | $ 253,246.97 | $ 235,717.47 | $ 17,529.50 | $6,544.35 | $10,985.15 |
| August 2003 | $ 246,365.52 | $ 233,211.66 | $ 16,923.64 | $6,318.16 | $10,605.48 |
| September 2003 | $ 252,356.09 | $ 235,068.32 | $ 17,287.77 | $6,454.10 | $10,833.67 |
| October 2003 | $ 273,576.62 | $ 255,213.86 | $ 18,362.76 | $6,855.43 | $11,507.33 |
| November 2003 | $ 315,144.27 | $ 299,100.19 | $ 16,014.08 | $5,978.59 | $10,035.49 |
| December 2003 | $ 331,547.04 | $ 315,235.04 | $ 16,312.28 | $6,089.92 | $10,222.36 |
| January 2004 | $ 333,116.98 | $ 316,070.98 | $ 17,046.00 | $6,363.84 | $10,682.16 |
| February 2004 | $ 304,559.34 | $ 287,301.76 | $ 17,257.58 | $6,442.83 | $10,814.75 |
| **TOTAL** | **$ 3,358,370.30** | **$3,199,932.07** | **$ 192,861.65** | **$72,001.68** | **$120,859.97** |

d. Signing of this modification does not waive any party's legal rights, remedies or defenses with respect to the remaining amount or any other related litigation as may be heard by any court, board, or any other forum of lawful jurisdiction.

This is the final decision of the Contracting Officer. You may appeal this decision to the Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. Instead of appealing to the Board of Appeals, you may bring an action directly in the U.S. Claims Court (except as provided in Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision. If you appeal to the Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedures for claims of $10,000 or less or its accelerated procedures for claims of $50,000 or less.

1 ATCH
Ordinance 27058, Rate Schedule, 2 pages

Summary for the Payment Office

The total funded amount of the contract remains unchanged. Funds are held in a MORD account and are not obligated by contract modifications.

## SCHEDULE HVG

## HIGH VOLTAGE GENERAL SERVICE

12.06.225

**AVAILABILITY:**

For general power use where a demand meter is installed and where a customer served does not require the use of Tacoma Power's distribution facilities other than substation transformation.

For customers who provide all of their own transformation from Tacoma Power's transmission system voltage, a credit of 27.29 percent will be applicable to the delivery charge.

**MONTHLY RATE:**

The sum of the following customer, delivery and energy charges:

1. Energy:
   All energy measured in kilowatt-hours at $0.029681 per kWh.
2. Delivery:
   All kilowatts of Billing Demand delivered at $3.78 per kW.
3. Customer Charge:
   $210.00 per month or any fraction thereof.
4. Exceptions:
   (a) Within the City of Fircrest:
      (1) Energy:
         All energy measured in kilowatt-hours at $0.031798 per kWh.
      (2) Delivery:
         All kilowatts of Billing Demand delivered at $4.05 per kW.
      (3) Customer Charge:
         $224.98 per month or any fraction thereof.

   (b) Within the City of Lakewood:
      (1) Energy:
         All energy measured in kilowatt-hours at $0.031798 per kWh.
      (2) Delivery:
         All kilowatts of Billing Demand delivered at $4.05 per kW.
      (3) Customer Charge:
         $224.98 per month or any fraction thereof.

## SCHEDULE HVG

## HIGH VOLTAGE GENERAL SERVICE

12.06.225 (concluded)

**MONTHLY RATE** (concluded):

4. Exceptions (concluded):

    (c) Within the City of University Place:
    (1) Energy:
    All energy measured in kilowatt-hours at $0.031798 per kWh.

    (2) Delivery:
    All kilowatts of Billing Demand delivered at $4.05 per kW.

    (3) Customer Charge:
    $224.98 per month or any fraction thereof.

**BILLING DEMAND:**

Determined by means of a demand meter, 30-minute interval, reset monthly. The Billing Demand shall be the higher of:

1. The highest measured demand for the month adjusted for power factor; or

2. 60 percent of the highest measured demand occurring during any of the preceding 11 months after adjustment for power factor.

For purposes of the determination of Billing Demand in subsection 2 above, the 11 months history shall be carried forward from the customer's previous account(s).

**SERVICE CONDITIONS:**

1. Power factor provision applicable.

2. Applicable provisions of the Tacoma Municipal Code, General Provisions, and Customer Service Policies governing the sale of electric energy shall apply.